

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,020

**MELISSA ELIZABETH LUCIO, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL
### CAUSE NUMBER 07-CR-885-B IN THE 138TH JUDICIAL DISTRICT COURT
### CAMERON COUNTY

HERVEY, J., delivered the opinion of the Court in which MEYERS, JOHNSON, KEASLER, COCHRAN, and ALCALA, JJ., joined. KELLER, P.J., joined except for points 4 and 11, in which she concurs. KELLER, P.J., filed a concurring opinion. COCHRAN, J., filed a concurring opinion in which JOHNSON, J., joined. PRICE and WOMACK, JJ., concurred.

### O P I N I O N

Appellant was charged with capital murder for the death of her two-year-old daughter, Mariah. A jury convicted appellant of this offense, and the trial court sentenced appellant to death pursuant to the jury's answers to the special issues at the punishment phase. Appellant raises fourteen points of error on direct appeal. Finding no reversible error, we overrule these points of error and affirm the trial court's judgment.

The evidence presented in this case shows that, at about 7:00 p.m. on Saturday, February 17, 2007, paramedics were dispatched to an apartment where appellant lived with nine of her children and an adult male named Robert Alvarez, who was the father of at least seven of these children and whom appellant referred to as her husband.[1] One of the paramedics (Nester) testified that, when the paramedics entered the apartment, they found Mariah unattended and lying on her back in the middle of the floor not breathing and with no pulse. Nester observed that appellant's "distant" and not "overly distressed" behavior was "so far out of the ordinary" that he "put it into the report." Nester also testified that he "noted the fact that [appellant] was not–she wasn't even within arm's reach of the child much less trying to gasp [sic], hold her, or trying to do anything to hold them [sic]."

Appellant told police and paramedics at the scene that Mariah had fallen down some stairs. Mariah was transported to a hospital emergency room where she was pronounced dead. The condition of Mariah's body indicated that she had been severely abused. There were bruises in various stages of healing covering her body, there were bite marks on her back,[2] one of her arms had been broken probably about two to seven weeks before her death,

---

[1] Appellant, who was born in June 1969, had previously been married and had several other children during this marriage. The record seems to indicate that appellant had twelve children in all at the time of Mariah's death on February 17, 2007. Two-year-old Mariah was the youngest of the children. It is not clear whether Alvarez was the biological father of Mariah, although Child Protective Service records seem to indicate that he is. Appellant gave birth to twins in October 2007 while she was incarcerated in the county jail for this offense.

[2] The forensic pathologist, who conducted Mariah's autopsy, testified that the bite marks on
(continued...)

and she was missing portions of her hair where it had been pulled out by the roots. The emergency room physician (Vargas) testified that this was the "absolute worst" case of child abuse that he had seen in his 30 years of practice. Vargas also testified that his emergency-room visual and manual inspection of Mariah indicated no apparent signs of a head injury.

The chief forensic pathologist for Cameron and Hidalgo Counties (Farley), who conducted Mariah's autopsy on Monday, February 19, 2007, testified that Mariah's cause of death was "blunt force head trauma," which would have occurred within 24 hours prior to her death, and it would have been immediately apparent that Mariah was in distress and in need of medical attention. Farley testified that Mariah suffered "multiple contusions" to her head area and that "blunt force head trauma . . . basically means, beat about the head with something–an object, a hand, a fist, or slammed." Farley testified that these injuries would not have been caused by falling down some stairs and that this was the most severe case of child abuse she had ever seen.

On the night of February 17, 2007, several investigators questioned appellant for about five hours, beginning at about 10:00 p.m. This interview was videotaped and was admitted into evidence in three separate DVDs (State's Exhibits, 3, 4, and 5). Appellant initially told the police that Mariah had fallen down some stairs on Thursday night, February 15, 2007. For about three hours, appellant denied any knowledge of how Mariah became so badly bruised and suggested that her older children could have been responsible.

---

[2](...continued)
Mariah's back could not be matched to anyone because "someone dragged their teeth across it."

Texas Ranger Escalon began to question appellant about two and one-half hours into the interrogation. Escalon testified at trial that, while he observed other investigators questioning her, he could tell from appellant's demeanor that she was "beat" and that she was "hiding the truth."

Q. [STATE]: Now, Officer, as you went in, you waited for a pause before you went in and you introduced yourself?

A. [ESCALON]: Yes, sir. I did.

Q. Can you describe to the jury how you go about doing that?

A. Well, my initial observation–that's when the investigation starts, is when I walked into the room and I see the investigators interviewing the suspect.

I'm just observing right now, trying to soak it all in, and see what we have, and try to get a better idea about this lady. And I observe her, how she's answering these questions, her demeanor, how she's standing. All of that is telling me–it's like a picture, almost–I'm observing everything, and that is already feeding me–that's already telling me what I'm dealing with. Okay? And then I see the investigators and I'm just making note–I'm am [sic] making note–you know: Okay. This is what I have.

Q. What type of demeanor would you describe her having?

A. When I walked in, she was not making eye contact with the investigator. She had her head down. So right there and then, I knew she did something. And she was ashamed of what she did, and she had a hard time admitting to officers what had occurred. That's what crossed my mind. And I knew she was beat. I knew–when I say she was "beat"–she was giving up. She wants to tell because she's giving that slouched appearance–you know: I did it. I've given up. I need to interview her, visit with her a little more. That's what I sensed. And I get that because of my experience in law enforcement, and my experience in interviewing people. Every time it's pretty much similar, in demeanor, in people and that's what I have experienced.

Q. Have you had other types of experiences in your experience as a trooper and

investigator in interviewing people?

A. That's one of the most common clues you would call–that you see–somebody with their head down, and like their shoulders are slouched forward, and they won't look at you. They're hiding–hiding the truth.[3]

Escalon testified that appellant began to "open up" with him after about 20 minutes of questioning. Appellant's recorded statement reflects that she told Escalon that she, and only she, had been "spanking" or "hitting" Mariah since sometime in December 2006. Appellant stated that Alvarez never "hit" or "spanked" Mariah and that Alvarez was unaware of most of the bruises on Mariah's body. Appellant also stated that none of the other children "beat" Mariah and that no one except appellant "beat" Mariah. Appellant also stated that Mariah had been in her care for at least the previous three days. The jury also saw appellant on the videotape demonstrate with a doll how she abused and "spanked" Mariah.

Appellant also stated that she would "hit" Mariah when appellant got mad. Appellant also described how she pinched Mariah's vagina and how she would sometimes grab and squeeze Mariah's arm. Appellant described how she bit Mariah twice on the back at different times about two weeks before Mariah's death. Appellant said that on one occasion she bit Mariah on the back for no reason while she was combing Mariah's hair. Appellant said, "I just did it." Appellant also stated that she would "spank" Mariah several times "day

---

[3]

From our review of appellant's recorded statement, we note that Escalon's voice is lowered when he initially began to speak to appellant and that it is difficult to ascertain a small portion of what he is telling appellant. Escalon was saying things to appellant like she needed to "make it right" by saying what happened to Mariah. We note that appellant made no claim at trial that critical portions of Escalon's interview with appellant are inaudible.

after day."

Appellant stated that Mariah was "sick" on the day that she died, but that she was afraid to take Mariah to the doctor because of all the bruises on her. Appellant also stated that Mariah would not eat and that her breathing was heavy. Appellant said that Mariah slept all day on February 17, 2007, and that she would lock her teeth together when appellant would try to feed her. This was consistent with "blunt force head trauma" symptoms that Farley described.

> Q. [STATE]: If the child suffers the type of brain injury that you've identified on this exhibit, would this child be able to sit up, eat Cocoa Crisps, and things of that nature?
>
> A. No. Usually with this kind of hemorrhage, the child has some type of immediate sign. Most of the time, they say they're very tired. They may seize and get very tense, and then relax, and get very tense, and then relax. People may not realize what it is, but sometimes parents will realize that that's a seizure, and they'll say, they're seizing. Yet, they've never had a seizure before.
>
> The other thing they will tend to do, is, the pressure increases because the brain will start to swell. They might start to vomit. And so if an ER doctor sees them, they may think they have a gastrointestinal virus, or something. But they're vomiting because of the pressure in the head. So seizing–lethargy being very tired. Coma is very consistent. Abnormal respirations–they're breathing a little funny. They take a big breath, and then they sit. And then it might go out. And then–ten seconds later, maybe another breath. So the breathing starts to also be affected as the brain starts to swell.
>
> Q. Like on this type of injury, how far back would those symptoms had [sic] been known to somebody that is watching the child? At least since the inception, or when?
>
> A. It's usually fairly quickly after the fatal blow occurs that they'll start to have the symptoms. And the first symptom is, they're usually, they're tired. They

can't keep awake. That's the lethargy. They just can't get them up–can't get them awake. They won't eat or drink, usually. And if they do, they vomit it.

Q. Do they ever suffer a condition where they can't open their mouth–where their jaws are locked?

A. If the jaws are locked, that's probably a seizure. Because things tighten up and you have muscles here that tighten and relax, tighten and relax, but it shouldn't stay that way, indefinitely.

Escalon also testified that, when he questioned appellant, he did not know, but he suspected, that Mariah had died from a fractured skull. Escalon can be seen and heard on the videotape informing appellant that an autopsy would be performed on Mariah and asking appellant "if they're going to find a fractured skull." Appellant replied that an autopsy would show that Mariah did not have a fractured skull, and appellant denied hitting Mariah in the head. Escalon also testified at trial:

Q. [STATE]: Now when you're going through the interview with her, did you know the cause of death–the exact cause of death at that point?

A. [ESCALON]: No, sir. I did not.

Q. Based upon your experience of being a police officer or a ranger, and a DPS trooper, did you have a suspicion of what that cause of death was?

A. Yes, sir. I did.

* * *

Q. What had you suspected occurred here to the child?

A. Head trauma.

* * *

Q. And I think at one point she admits to all of the [visible] injuries except for the scratch on the face and one on the heel?

A. Yes.

\* \* \*

Q. Now in the video, there is no actual–she doesn't actually say that she in one direct blow, or one direct shot, hits Mariah on the head, or the head area other than general spanking. Is that true?

A. Yes, sir.

\* \* \*

Q. [DEFENSE]: Okay. But the head trauma you didn't learn until, when you went into the autopsy, when you found out there was brain hemorrhage, and that's what killed this child. Not the beatings, and the black and blue marks all over her body?

A. [ESCALON]: Again, when she was telling me what she did to that child, led [sic] me to believe based upon my experience the head trauma was very suspicious in this case.

\* \* \*

Q. The emergency room doctor, yesterday, stated that you couldn't see that there was brain hemorrhage, and that the brain hemorrhage was something that wasn't noticeable until later on.

A. There's other signs of trauma that can cause bleeding inside of the brain. It doesn't have to be visible. Other signs of shaking–hitting.

A police officer (Villarreal) testified that he allowed appellant to make a cell-phone call to her sister while he was transporting appellant to a dental office for a dental mold. Villarreal testified that appellant appeared to be agitated and that he heard her say during the telephone call, "Don't blame Robert. This was me. I did it. So don't blame Robert."

The defense presented the testimony of a medical expert (Kuri), who seemed to testify that Mariah's fatal injuries could have been caused by a fall down the stairs.

Q. [DEFENSE]: And your testimony, basically, is that the falling down the stairs is consistent with–just as consistent with the cause of death of this child as what the State is trying to suggest as the beating?

A. Well, we received a patient–a body that have [sic] a severe head injury. It

was not caused by a simple force. It was caused by a serious force. So what type of serious force? But she–the mother hit her against the wall or somebody else? I am not saying the mother. But any person that would have caused her, okay, or fell, that's trauma. See? There's trauma on the head. What produced it? I don't know. I don't think–in the head, it is specific. There is no doubt that she died because of the hemorrhage that was produced by the trauma. Now, if you ask me the question: Which would be the type of trauma? So, if she fell from the stairs and rolling, if that's how she died? That could be one. Hitting against the board? Yes. Hit by a strong force? Too. It could be.

During closing jury arguments, the defense argued that the jury should acquit appellant because she was guilty only of "injury to a child" for the nonfatal injuries that she inflicted upon Mariah before the fatal injuries that Mariah suffered for which appellant disclaimed responsibility. The defense also claimed that appellant was guilty only of "injury to a child" for failing to get medical attention for these fatal injuries.[4] The defense thus claimed that appellant did not cause any of Mariah's fatal injuries. The defense also questioned whether the State's evidence excluded the possibility that these fatal injuries were caused by Mariah falling down stairs.

> [DEFENSE]: Now, in the opening remarks that we made in the beginning of the trial after you were all seated here, I told you my client is not up for "Mother Of The Year." I told you that my client is guilty of injury to a child. She is and she has admitted that. The question here before you is whether or not on February 17, 2007, Melissa Lucio intentionally and knowingly killed Mariah Alvarez. That's the issue. That's the issue. Not whether she beat her. Not whether she broke her arm. Not whether she's a lousy mother or didn't provide for her children. That's not an issue. The issue is whether or not she killed Mariah on the 17th of February, 2007.

---

[4]

The jury was not instructed that it could convict appellant of capital murder under an omission theory—for example, that appellant caused Mariah's death by failing to get her medical care.

* * *

This whole case revolves around this video. This video is real important. If you have–if you cannot remember it all, play it again. It's a long, long video. And I'm sorry for that. But this is the key to everything in this case.[5]

* * *

Folks, the State wants you to believe that that's a confession. Does the State know at the time of the video, the caused [sic] of death of Mariah? No. They don't know the cause of death of Mariah until the next day when they go do the autopsy. They learn after the autopsy that Mariah died from brain hemorrhage. Blunt force trauma to the head. That's when they first know about it.

She confessed to what? She confessed to bruising that child from head to foot. She confessed to neglect. She didn't confess to murder.

* * *

But I want to go back to the video because the video says a lot. The video is very important. Study that video because that's where the [sic] all of the key is [sic]. Melissa Lucio said things. She didn't have an attorney. Nobody is there to coach her and tell her what to say or how to say it. She's there on her own. She has got Salinas, Cruz, Banda, Villarreal, and Escalon. Five law enforcement officers throwing questions at her. She's there on her own. Nobody is helping her.

And she has told everything she knows and nobody is listening. She is telling us much: I beat this child. I neglected this child. I hurt my child, but I didn't kill her. I didn't hit her in the head. So how did she get the brain hemorrhage? Fell down the stairs. She fell down the stairs. Melissa Lucio says she fell down the stairs. What evidence does the State have to prove to you that this is not possible, that it didn't happen? They don't have anything.

* * *

And there's a reasonable doubt, and that is the possibility of falling down the stairs.

The State argued that the evidence and inferences from the evidence that appellant abused Mariah show that it was appellant who inflicted Mariah's fatal injuries.

---

[5] This is the video that appellant claims in points of error two and three is inaudible.

[STATE]: What injuries did the child have, if not a brain injury? Well, they tried to differentiate between: Well, you know what? I may have caused 110 bruises. I may have caused two or three bites on the body. I may have twisted the arm and broken it. But you know what? I never hit her on the head. Is that reasonable? Is that reasonable? That child was slapped, according to Dr. Farley, that child was hit across the head and that's what caused the brain hemorrhage. It wasn't. Because the evidence was inconsistent because of the abuse that this child had taken.

* * *

But the bottom line is she committed the acts which led to the cause of [Mariah's] death. This child had bruised kidneys, a bruised spinal cord and bruised lungs. How do you do that? I mean, what force does it take somebody to cause such devastating injuries to a child and then say: You know what? I never touched her across the head. That's just totally–totally unbelievable.

* * *

You can draw inferences from the evidence, ladies and gentleman. And the inference is clear that she caused those injuries because it's consistent. It's consistent with her behavior. It's consistent with her pattern of conduct towards this child. If this child had just come in with a head injury and nothing else, you might have said: You know what? It may have been a fall.

The State presented evidence at the punishment phase that appellant has a prior driving-while-intoxicated conviction. The State also presented evidence that appellant committed several disciplinary violations in the county jail such as fighting with and having verbal disagreements with other inmates, possession of contraband, unauthorized communication with another person, and being disrespectful to a guard. The defense characterized these incidents as minor. The State also presented the testimony of a criminal investigator (A.P. Merrillet) for the State of Texas Special Prosecution Office, who testified about the opportunities that a life-sentenced appellant would have to commit criminal acts of violence in prison. Merrillet also testified that he had prosecuted many prison guards for having consensual and nonconsensual sex with female inmates. The defense elicited

testimony from Merrillet on cross-examination from which a jury could conclude that there would be a low statistical probability that a life-sentenced appellant would be dangerous in prison.

The State also presented the testimony of Estrada, who was a Child Protective Services (CPS) case worker. Testifying under a grant of transactional immunity because "[t]here was talk about [CPS] being indicted" as a result of Mariah's death, Estrada testified that CPS removed Mariah and all of the other children living with appellant from appellant's home for physical neglect and negligent supervision just after Mariah was born on September 6, 2004, and placed them in foster care.[6] Appellant visited Mariah while she was in foster

---

[6]

In her recorded statement, appellant told the police that CPS removed the children on September 21, 2004. A CPS specialist (De La Garza) executed an affidavit (State's exhibit 41) on September 22, 2004, describing the conditions in appellant's home at this time. This affidavit recites in part,

On September 21, 2004, I made a second home visit at the residence to address the allegations on the second report. At this time, the home was found to be unsafe for the children. Ants were seen crawling on the floor and mattress where the newborn baby, Mariah, was sleeping. There was a fan in the window that had no cover, leaving the blades exposed. Inside the refrigerator, there was only a rotten head of lettuce, a carton of eggs and a plastic container of mayonnaise. The refrigerator had an odor of spoiled food. The pantry contained one small can of corn, a box of salt, sauce, a small box of infant mixed cereal, and empty condiment containers. There was a strong odor of urine throughout the house.

On September 21, 2004, I made contact with Robert, Gabriel, Adrianna, Sara and Mariah Alvarez at their residence. Robert (4 years old) was observed with a dime size bruise on his stomach, an old scratch on his stomach that was about 3 inches longs [sic] and insect bites on his arms and legs. He was also observed to have 2 staples on his head, reportedly from an injury he sustained from falling off the bed. Gabriel (3 years old) was observed with a bite mark the size of two quarters on his left shoulder, multiple scratches on his face and multiple insect bites on his arms and

(continued...)

care. CPS returned Mariah and eight other children to appellant's home on November 21, 2006. Appellant told the police, during her recorded statement, that she was not close to Mariah because CPS removed Mariah from her home three weeks after she was born.

Estrada also testified about the various contacts that CPS had with appellant between December 21, 1995, and Mariah's death on February 17, 2007. Estrada testified that the CPS investigated various allegations, usually involving allegations of neglect and neglectful supervision, in 1995, 1996, 1998, 2000, 2001, 2002, 2003, and 2004. Estrada testified that

---

[6](...continued)
legs. Adriana (2 years old) was observed with a one-inch linear scab on the top of her head and multiple insect bites on her back, arms, and legs. Her body was very dirty, with dried feces on her genital areas. Sara (1 year old) was observed to have a half-inch cold sore on the bottom of her lip and multiple insect bites on her arms, legs, and body. She also had an open circular mark on the right side of her leg that appeared to be infected with pus. Sara was observed to be wearing neither underwear nor a diaper. Her body was very dirty with dried feces on her genital areas. Mariah was observed to have tremors every once in a while. She was also observed to have a small light green bruise on her right foot. No other visible marks were seen. All of the children appeared as if they had not been bathed. Their hair appeared to be matted and dirty. Their bodies appeared to be dirty and all of the children had a strong body odor.

* * *

On September 21, 2004, I made contact with Melissa Lucio. A drug test was administered at this time. Ms. Lucio tested positive for cocaine, but continued to deny using drugs. According to Ms. Lucio, her husband Roberto Alvarez, was going to get groceries some time that day. She stated that sometimes the family goes to eat at Loaves and Fishes because she gets tired of cooking. Ms. Lucio admitted to having previous CPS history involving drug use and stated that she participated in services through the Department. Ms. Lucio indicated that she did not have any family members who could take care of her children. She stated that the father to her older children resided in Houston, Texas, and that he would be willing to take responsibility for them. Ms. Lucio stated that Roberto Alvarez, father to her 7 youngest children, worked late and could not make contact with this worker. Mr. Alvarez has not made contact with this worker at this time. Ms. Lucio was not able to provide this worker with any viable placement for her children.

appellant often tested positive for cocaine and that two of appellant's newborns tested positive for cocaine during this period of time.[7] Estrada testified that "since '04 [appellant] had about 17 or 18 positives and about 11 negatives." The defense suggested, through its cross-examination of Estrada, that CPS should not have returned the children "to a parent who tested positive for drugs 18 times and negative for drugs 11 times."[8]

Estrada also testified that appellant tested negative in the two drug tests that were offered between November 2006 and February 17, 2007. In her recorded statement, appellant told the police that she had not used drugs since February 2006, but that Alvarez had recently begun using crack cocaine. The police found paraphernalia for smoking crack cocaine in a search of appellant's apartment after Mariah's death. Farley testified that Mariah had cocaine in her blood at the time of her death. Other evidence was presented that appellant received about $5,000 per month in welfare benefits most of which the State claimed appellant used to support a cocaine habit.[9]

---

[7]

The testimony seemed to conflict on whether Mariah tested positive for cocaine when she was born. Estrada testified that appellant tested positive for cocaine when Mariah was born, but that Mariah was not tested. One of appellant's mitigation experts, however, testified that Mariah tested positive for cocaine when she was born.

[8]

Appellant also elicited testimony from one of her mitigation experts (Villanueva) suggesting that CPS "failed to do what they were supposed to do." During its closing punishment-phase jury arguments, the defense stated that it was not going to "complain about Child Protective Services" because "that's not an excuse . . . for Melissa Lucio's actions."

[9]

The State commented on this during its closing jury arguments:

(continued...)

Appellant presented the testimony of two mitigation experts (Villanueva and Pinkerman). These experts testified, based primarily on appellant's statements to them after the charges in this case had been filed, that appellant was depressed and that she was a battered woman and had been sexually abused as a child. For example, Villanueva and Pinkerman testified,

Q. [DEFENSE]: Was she–is there any indication that she was ever abused as a young child?

A. [VILLANUEVA]: Yes, she was. She was sexually abused by one of her mother's lovers, a live-in lover, and it lasted for approximately two years, the duration that he was in the home.

\* \* \*

Q. [DEFENSE]: Is there any kind of abuse by her first marriage?

A. [VILLANUEVA]: Yes. Her first husband, which was her only legal marriage, Mr. Lucio, he was an alcoholic. And he was emotionally and verbally abusive most of the time and physically abusive when he was drunk. But being an alcoholic, that was quite active. There was also a very manipulative relationship there with her sister-in-law Sylvia, who introduced her to cocaine. She was 16 years old.

\* \* \*

Q. [DEFENSE]: And your findings in this case?

---

[9](...continued)
You know what the children guaranteed them? The food stamp money that you can convert to drugs, and the AFDC check that you can convert to drugs. That's what the children represented to them. Because they sure as heck weren't feeding them. They weren't caring for them. They weren't taking them to the doctor.

So why would you want to have 13 children with you? Because the State of Texas gives you that money. And because–and that's evident by the fact that they were evicted under the investigation for failure to pay their rent. That the house was a pigpen according to some of the reports. Why? If you're getting 24 or $2,500 a month, and they're working, why do they not have the resources to buy groceries? It's bad for cocaine.

A. [PINKERMAN]: In the part of the assessment with the intelligence test, the other part is more of a personality test to determine my general diagnostic impressions. And my general diagnostic impressions of her were that she was overutilizing a lot of repression and denial. And repression to the point where, again, a disconnect between thoughts and feelings or experiences and feelings. And I saw that in both her test behavior and in my observations that I reported earlier.

In assigning diagnosis to her, what I identified is that she had a presentation consistent with major depression with prior substance abuse which was in remission. But maybe most importantly post traumatic stress disorder in how she, I guess, psychologically was organized. And those are the three major areas of concern that I saw with her. She was also, and I also acknowledged it in a different report, the victim of prior physical and sexual abuse both as an adult and as a child.

Villanueva also testified that appellant "has no history of aggression at all as a child, adolescent or through her entire CPS history, which was a good part of her adult life."

Pinkerman testified that there is a low probability that appellant is a risk to reoffend "in a prison setting."

Q. [DEFENSE]: And what did you use to reach that conclusion. [sic].

A. [PINKERMAN]: Her presentation in the interview, the history that I had before me, her description of the history, the psychological testings like I'd done with her in my formal psychological evaluation, and then the large body of literature both in the psychological literature and in the State Department of Corrections literature that talks about the different levels of risk for offenders within a prison population. Because when I'm looking at the risks, I'm not considering getting the parameters of the present circumstances any issue of risk to the community. That is often not a part of my assessment.

Q. And your opinion then, sir, is what?

A. Her risk–there's–okay. I'll try to just answer your question. There's a low probability that she's a risk to reoffend–

Q. Okay.

A. –in a prison setting.

During its initial closing jury arguments, the State emphasized the "horrific" circumstances of this offense, appellant's "history" of violence against Mariah, and appellant's misbehavior in the county jail in arguing that "[t]his isn't going to end with Mariah. This is going to continue."

> [STATE]: The defense argued at the beginning of this trial that Mariah died of injury to the child. She was beaten. Now, the first expert told you that the defendant–there is no history of aggression at all. She's obviously wrong. That's not what the defense told you. That's not what the [police] video shows. And she demonstrates on that video how she hit that little girl time and time again. There is history of aggression. Mariah's death is proof of that. What can you conclude from the first expert's testimony? She is simply wrong. She got it wrong.
>
> The next expert tells you: No history of violence. Again, remember what [appellant's lawyer] told you? She's guilty of injury to a child. She's guilty of beating that little girl. Well, obviously this expert got it wrong, too.
>
> * * *
>
> What can you conclude? Look at Mariah. You've seen the photographs. No history of violence? Really? Are we talking about the same person, the same defendant? They got it wrong.
>
> I want to talk to you about Mariah and the nature of this crime against her. Because we've all seen the photographs. We heard from Dr. Vargas who told us it's the worst he's ever seen in his 30 years. Dr. Farley told us the same thing. Worst case of child abuse ever in our community. Look at this little girl. Look at her. She was defenseless, innocent. Her daughter.
>
> The nature of this crime speaks for itself. She was beaten to death. This is not one time. Deliberate acts, over, and over, on this poor little girl. This is a crime of hatred. A crime of violence. Not just one time. Not an accident. The manner of death of which this little girl died is also tragic. It's also horrific.

There's many of you on this jury that work in the medical field and can understand the suffering that she endured from her little brain swelling. Dr. Farley told you that brain swelling inside her head, went into her spinal cavity, she would have suffered. She would have trouble breathing. She would have seizures and just lay there. She let her lay there and suffer.

A very painful cruel death. That is what is so horrific about this case, that this little girl laid there in that bed when she could have simply called for help, taken her to the doctor, done something to protect this little girl. The manner of death in this case is so horrific because she suffered for so long, this little baby girl. It was simply torture and cruel.

\* \* \*

And I want you to look at her jail record because this jail record speaks to you about the type of person that she is. And in the short time that she's been in jail she has had physical altercations, verbal altercations, been in possession of contraband, unauthorized communication, inciting a riot, and confrontational towards the staff. What does that tell you about the type of person that she is now? And that's only here in our jail. Imagine what she's going to be like when she gets to Huntsville or wherever she ends up. Look at these records, because they records [sic] speak for themselves.

This defendant is like a dog that bites a human person. Once that dog bites, they will always have–there will always be a probability that it will bite again. Same thing with this defendant. Her record speaks to you: This isn't going to end here. This isn't going to end with Mariah. This is going to continue.

The defense argued during its closing jury arguments that the State did not present

"one scintilla of evidence as to future dangerousness."

[DEFENSE]: The first question has to do with future dangerousness. What have we heard one scintilla of evidence as to future dangerousness of this person?

We had the guy, Mr. Merrillet, or whatever his name was, from Conroe. If you take his own statistics, he never spoke about Melissa specifically. Never once did he talk about her. In fact, he came up here and told you, I'm not going to talk about her. I don't know her life. So he gives statistics.

What are the statistics he gave us about the future dangerousness of criminals

in general? He told us there are 12,000 female inmates in the Texas Department of Corrections as of 2007. That's 12,000. How many assaults were there in that population? Seventeen. That is one one-hundredth of a percent.

What else do they bring you here? They bring you the jail records. This is one thing where I agree with the State. Please, look at Melissa's jail records. Look at them. They bring to you that she was in a dorm with eight people and they found tattooing equipment above the lights. None of the girls would admit to having been the owner of it. So that is evidence of future dangerousness? Oh, but she was in a fight. Look at the fight. You all look at them. I saw you all looking at the records. She got in blocked punches in one of the fights. The other one, the girl hit her. Please. There's not a scintilla of evidence of future dangerousness, much less beyond a reasonable doubt.

What else do they bring here of future dangerousness? To answer question number one, she's got a past history, a criminal history. What was that? A DWI. If we poll the people in this courtroom today sitting here, throughout this courtroom there would be a good number of folks who've gotten a DWI. It doesn't mean that they are a future danger.

What didn't they show you? They didn't show you one past act of physical abuse to any children. Not one. They didn't show you one past act where she's ever been charged with a crime involving any physical harm to anyone else.

\* \* \*

Is there a probability of continuing acts of violence? Probably not. We've heard that from the State's main person who they bring down because just from the statistics, there's no probability. We heard it from Dr. Pinkerman who also said there's very little probability that she would ever do anything of violence.

During its final closing jury arguments, the State emphasized appellant's behavior in the county jail and her abuse of Mariah over a period of time in support of its argument that appellant "has already shown a tendency to be violent . . . to be abusive, to be aggressive and to injure innocent people."

[STATE]: This wasn't an isolated incident where she lost it and she killed this child. She made this child suffer. Every time she injured this child she had to have gotten some pleasure from it because she didn't do it one time. She did it over a period of weeks and probably months.

Is this a person that you want out there in a society of prisoners? She has already shown a tendency to be violent, ladies and gentlemen, to be abusive, to be aggressive and to injure innocent people. She's just as likely to go after the innocent–other innocent individuals, people that may be within the prison system. Because Mr. Merrillet has told you that they don't classify them by capital murder. They can put him [sic] in with a burglar, with somebody who's writing hot checks. She can victimize other individuals.

\* \* \*

Try to marginalize her behavior in jail now. That's what we're being accused of. We've looked at the little things to show a consistent pattern. Even now when she's caught in jail, awaiting trial, whatever rules she can still break, she's still breaking them.

Her own people say, she has a history of that. She's not going to change her stripes. Is she going to do that automatically because you spared her? No. She's never going to changer her stripes.

In point of error two, appellant claims that she is entitled to a new trial under Texas

Rule of Appellate Procedure 34.6(f)(4) because the "audio of the defendant's statement to

the police is inaudible." *See id*. (setting out when an appellant is entitled to a new trial when

a reporter's record is lost or destroyed). Appellant argues,

The audio of the defendant's statement to the police is inaudible. Counsel objected at trial. The reporter said the audio was inaudible.[10] The trial judge

---

[10]

We do not read the record to support this assertion. When the defense complained at trial that the court reporter was not transcribing appellant's recorded statement, the trial court replied that the court reporter was "having a difficult time, making the transcription" and that the court reporter would "attach a copy of the videotape and write down 'Video Played.'" After some discussion about the audio quality, the State indicated that it would provide the defense with a certified transcription of appellant's recorded statement. The defense seemed satisfied with this and made no request that

(continued...)

included the discs in the record. Appellant timely requested a reporter's record. Appellant moved the Court of Criminal Appeals to direct the reporter to transcribe the audio on the videodiscs of defendant's statement to the police; the Court denied the motion.[11] The inaudible portion is significant, since it is the audio of the defendant's statement. The audio is necessary to the appeal's resolution; appellant maintains that the evidence is both legally and factually insufficient to sustain the verdict of guilty and that it is both legally and factually insufficient to sustain the "Yes" response to the query re future dangerousness, resulting in a penalty of death. Counsel cannot agree on any statement of the audio. TEX.R.APP.P. 34.6(f).[12]

The State responds "that the present situation is not one in which anything has been lost; instead, this is a situation where the evidence is what it is; an audio recording which does require some effort to hear, but is nevertheless audible." The State argues that Rule 34.6(f) does not apply here because "there is nothing missing from the Reporter's Record–the same recordings of Appellant's statement which were introduced as State's exhibits 3, 4, and

---

[10](...continued)
the trial court order the court reporter to transcribe appellant's recorded statement. The record does not reflect that the State provided the defense with a certified transcription of appellant's recorded statement or that appellant objected to the State's failure to do so. On this record, appellant failed to preserve any error in the court reporter's failure to transcribe appellant's recorded statement or to the State's failure to provide the defense with a certified transcription of appellant's recorded statement. *See* Tex. R. App. P. 33.1(a).

[11]

On August 25, 2009, appellant filed a motion in this Court requesting this Court "to direct the court reporter to provide an official transcription of the defendant's oral statement recorded on video and played before the jury." In support of this motion, appellant claimed that the record is incomplete without this transcription. This Court denied the motion on September 16, 2009.

[12]

The State disputes that any part of appellant's recorded statement is inaudible. The State asserts that while "the audio volume did drop off and was somewhat low in some places of the statement, this problem was easily remedied by raising the volume and listening closely to the audio." The State also asserts that "[l]istening to the audio through a set of earphones, rather than through speakers, was also helpful."

5 at trial, are the same recordings which have been copied and included in the Reporter's Record as exhibits 3, 4, and 5."

We agree. Appellant's claim that certain portions of the audio of appellant's recorded statement to the police are inaudible does not mean that these portions of the court reporter's record are "lost or destroyed" for purposes of Rule 34.6(f). There is nothing missing from the reporter's record. Point of error two is overruled.[13]

In point of error three, appellant claims that the trial court erred to admit her recorded statement into evidence. Appellant argues,

> The trial court erred in admitting the videodisc of Ms. Lucio's statement. Her statement was involuntary. The state's own witness said Ms. Lucio was "brought" to the station by the police. There was no warrant. There was no probable cause. There was no probable cause plus the defendant's being about to escape. A reasonable person would not have felt free to leave after having been "brought" to the police station by the police. There was no testimony that she understood her rights before she gave the statement.

> The trial court's finding that the statement was voluntary was unjustified in the light of the evidence that Ms. Lucio was "brought" to the police station by the police, was never taken before a judge, and was interrogated for hours.
>
> * * *
>
> We cannot tell from the audio of the video that the police gave Ms. Lucio the required Miranda[14] and TEX.CODE CRIM.P. warnings. We cannot tell because the court reporter did not transcribe the audio because he could not hear it. A

---

[13]

We have listened to appellant's recorded statement, and while we find that a word here or there might be inaudible, we do not find any inaudible portion of appellant's recorded statement is necessary to the resolution of this appeal or to any understanding of the context of the exchange between appellant and the police. The audio quality of appellant's recorded statement is sufficient for this Court to fairly resolve this appeal.

[14]

*Miranda v. Arizona*, 384 U.S. 436 (1966).

person "brought" to the police station by the police and interrogated at the police station by the police would not have felt free to leave.

With a presumptively illegal arrest made without a warrant, no evidence of being about to escape, the defendant being "brought" to the station by the police, and no evidence on the tape that there were any warnings given, much less the required Miranda and TEX.CODE CRIM.P. warnings, the trial court abused its discretion in admitting the defendant's statement.

The record reflects that the State introduced appellant's recorded statement through Detective Cruz. Appellant's only non-general, specific objection to the admissibility of her recorded statement was that "all voices on the recording" were not identified.[15]

> [DEFENSE]: I'm going to object to these [State's exhibits 3, 4, and 5] coming in because they don't comply with the statute.
> * * *
> 3822 requires all voices on the recording be identified, and they're not. There are people that are walking in and out. People are yelling things, talking–and they're not identified. They are not even shown–some of them. And–according to–3822, they got to be–it's got to be in compliance.
> * * *
> [TRIAL COURT]: But my main concern is whether or not the recording in and of itself shows that it's voluntary. After it's voluntary, then the other concern is whether or not the voices can be identified. Whether they are included within the copy of the statement, or not, is a separate issue. So, I'm going to look at the first part of the recording with regard to the voluntariness of it–
> * * *
> (Videotape Played with Officer Cruz interviewing the defendant and stopped at 10:37 a.m.)
>
> [TRIAL COURT]: Put it on pause, just a minute. Mrs. Cruz there was a voice there. Can you identify that voice?
>
> [CRUZ]: That's Detective J.M. Salinas.

---

[15]

See TEX. CODE CRIM. PROC. art. 38.22, § 3(4) (providing that no oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless "all voices on the recording are identified").

[TRIAL COURT]: Okay. And as we proceed throughout the interview, you will be able to identify each and every voice?

* * *

[CRUZ]: Yes.

[TRIAL COURT]: Okay. Thank you. Proceed.

(Video 1 [State's exhibit 3] continues to Play and paused at 10:40 a.m)

[TRIAL COURT]: Mr. Padilla, would you stop it please?

It appears to me that [appellant] understood her rights, and that it was voluntary. So, unless you have any evidence to show any duress, or anything like that, I'm going to allow it to be played to the jury.

[DEFENSE]: All right. Note my exception. Even though I don't think it's in compliance with the statute.

On this record, we decide that appellant's objection that not all voices on the recording could be identified failed to preserve any voluntariness, lack-of-warning, or illegal-arrest claims relating to the admissibility of her recorded statement. We further note that a listener can clearly hear on State's Exhibit 3 appellant being informed of her *Miranda* rights and appellant stating that she understood them, and see appellant signing a "waiver" of these rights before the police began to question her.[16] Appellant's subsequent course of conduct is also consistent with a waiver of these rights. *See Joseph v. State*, 309 S.W.3d 20, 24-26 (Tex. Crim. App. 2009) (stating that, in absence of express and explicit waiver of *Miranda* rights, the totality of circumstances may show voluntary waiver of these rights) and at 29

---

16

This is also reflected in State's Exhibit 1, which informs appellant, in writing, of her rights. She initialed each right to acknowledge that she understood it and also waived each of those rights.

(Cochran, J., concurring) ("Under some circumstances, if a suspect has been fully warned of his rights and has indicated that he understood those rights, a course of conduct consistent with waiver 'may' support the conclusion that he suspect has waived his *Miranda* rights.").

In addition, after having thoroughly reviewed appellant's recorded statement, we decide that it supports the trial court's finding that it was voluntary. Appellant's recorded statement fairly reflects that the interrogation techniques employed in this case are not the type of brutal "third-degree" techniques that would render a defendant's "statements to have been involuntary in traditional terms." *See Miranda*, 384 U.S. at 455-57; *State v. Terrazas*, 4 S.W.3d 720, 723-24 (Tex. Crim. App. 1999) (explaining that the voluntariness test is whether "the confession is the product of an essentially free and unconstrained choice by its maker" and whether the confession is true or false is irrelevant to a voluntariness determination because "it is the methods used to extract an involuntary confession that offends constitutional principles" (internal quotes omitted)) and at 726-27 (discussing examples of interrogation methods that offend constitutional principles). We further note that appellant has not cited to any portions of her recorded statement where she claims that the police used improper interrogation techniques. Point of error three is overruled.

In point of error six, appellant claims that the evidence is legally insufficient to support her conviction. The jury charge, consistent with the indictment's allegations, authorized the jury to convict appellant if, among other things, it found that appellant caused Mariah's death "by striking, shaking, or throwing Mariah Alvarez with defendant's hand or

foot or other object unknown to the Grand Jury."

In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

Appellant argues that the evidence is legally insufficient to support her conviction because it does not show that appellant "admitted anything more than striking the child at some time, does not show that Ms. Lucio was the one who used the blunt force head trauma, and does not show that Ms. Lucio had exclusive access to the child during the time-period during which the autopsy doctor said the blunt force was stricken." Appellant also argues that her statement to her sister during their cell-phone conversation that "I did it" is "too vague to amount to proof of a crime, much less this offense." The State argues that a "jury could have reasonably concluded that Appellant was responsible for delivering the fatal blow

to . . . [Mariah's] head, as she had the opportunity to do so, and she had admitted to a pattern of abuse that had continued for some two months."

The evidence in this case shows that appellant had the opportunity to inflict Mariah's fatal injuries as she was Mariah's primary care-giver when these injuries were inflicted. Appellant told the police several times that only she would "spank" or "hit" Mariah. Appellant also stated to the police several times that neither Alvarez nor any of the other children hit Mariah. The jury also saw pictures of the numerous bruises on Mariah for which appellant took sole responsibility. A jury could reasonably infer from this evidence, including appellant's pattern of abuse of Mariah, that appellant caused Mariah's fatal injuries. A jury could also reasonably infer that appellant was referring to Mariah's fatal injuries when she told her sister during their cell-phone conversation that she "did it." We decide that "the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *See Hooper*, 214 S.W.3d at 13. Point of error six is overruled.

In point of error seven, appellant argues that the evidence is factually insufficient to support her conviction. We do not review the factual sufficiency of the evidence to support a jury's finding on the elements of a criminal offense that the State is required to prove beyond a reasonable doubt. *Martinez v. State*, 327 S.W.3d 727, 730 (Tex. Crim. App. 2010); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) and at 926 (Cochran, J., concurring, joined by Womack, J.). Point of error seven is overruled.

In point of error eleven, appellant claims that the trial court erred "in overruling the

defense objection that the proposed instruction did not include a lesser included offense of injury to a child." The indictment in this case alleged that appellant "did then and there intentionally or knowingly cause" Mariah's death. The trial court refused to submit appellant's proposed written jury instruction that would have permitted the jury to convict appellant of injury to a child upon finding that appellant "did then and there cause serious bodily injury" to Mariah.[17] The trial court appeared to rule that there was no evidence to show that if appellant is guilty, "she's only guilty of the lesser offense" because the evidence showed an intentional striking resulting in death.[18] The trial court's ruling left the jury with the option of convicting appellant of capital murder or of acquitting her.

Appellant's brief sets out portions of the charge conference during which the parties and the trial court discussed whether appellant was entitled to an injury-to-a-child jury instruction. Appellant's brief also asserts that the "defense preserved error by submitting a

---

[17] Appellant's proposed written jury instruction also would have instructed the jury that the law provides "that a person commits an offense if he intentionally or knowingly by acts causes serious bodily injury to a child." *See* TEX. PENAL CODE § 22.04 (a)(1) (providing that a person commits offense if she intentionally or knowingly causes serious bodily injury to a child). And Appellant's proposed written jury instruction would have instructed the jury that "serious bodily injury" includes death. *See* TEX. PENAL CODE § 1.07 (46) (defining "serious bodily injury" as bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ).

[18] *See Williams v. State*, 294 S.W.3d 674, 678-79, 682 (Tex.App.—Houston [1st Dist.] 2009, pet. ref'd) (deciding, in a case factually similar to the present case, that there was "not more than a scintilla of evidence that [the defendant] was guilty only of the lesser offense of injury to a child and not the greater offense of capital murder" because "proof that [the defendant] intentionally or knowingly intended to cause the death of the child will as a matter of law always establish that [the defendant] intentionally or knowingly intended to cause serious bodily injury to the child").

proposed instruction on injury to a child as a lesser included offense." Appellant's brief

further asserts,

> Injury to a child is a lesser included offense of capital murder. **In re L.M.**, 993 S.W.2d 276, 283 (Tex.App.–Austin 1999, pet. denied).[19] There was some evidence that Melissa said she hit the child. The evidence does not say when she did that. The autopsy doctor said that the fatal blow was struck [sic] within 24 hours of death.

Appellant's brief cites to portions of the record supporting these factual assertions.

Appellant's brief then concludes by stating,

> The error was not harmless beyond a reasonable doubt. Had the lesser offense been submitted, the jury might have found Ms. Lucio guilty of the lesser offense. Injury to a child is not a capital offense. TEX.PEN.CODE § 22.04(e) & (f).

Appellant's brief contains no argument or citation to any authority that might support

an argument that if she is guilty, she is guilty only of injury to a child. *See Hall*, 225 S.W.3d

at 536 (stating that the second step of the lesser-included-offense analysis requires a

determination of whether "there is some evidence in the record that would permit a jury

rationally to find that if the defendant is guilty, [s]he is guilty only of the lesser-included

---

[19] This is arguably correct under our decision in *Hall v. State* as it does appear that "intentionally or knowingly causing serious bodily injury" to Mariah were "facts required" to establish the indictment's allegation of "intentionally or knowingly causing [Mariah's] death." *See* TEX. CODE CRIM. PROC. art. 37.09(1) (providing that an offense is a lesser-included offense "if it is established by proof of the same or less than all the *facts required* to establish the commission of the offense charged" (emphasis added)); *Hall v. State*, 225 S.W.3d 524, 535-36 (Tex. Crim. App. 2007) (holding that first step of lesser-included-offense analysis under the cognate pleadings approach requires a comparison of the elements of the offense as they are alleged in the indictment with the elements of the potential lesser-included offense).

offense" (internal quotes omitted)).[20] We decide that this point of error is inadequately briefed and presents nothing for review as this Court is under no obligation to make appellant's arguments for her. *See* Tex. R. App. P. 38.1(I); *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008) (affirming that this Court has no obligation "to construct and compose" a party's "issues, facts, and arguments with appropriate citations to authorities and to the record" (internal quotes omitted)); *Cardenas v. State*, 30 S.W.3d 384, 393-94 (Tex. Crim. App. 2000) (deciding in a capital case that the defendant's points, complaining of the lack of a jury instruction on the voluntariness of the defendant's statements to the police, were inadequately briefed "by neglecting to present argument and authorities" in support of them).

Point of error eleven is overruled.[21]

---

[20] We take note of case law that might support an argument that appellant was not entitled to an injury-to-a-child jury instruction because the evidence showed her, at the least, to be guilty of a homicide, even though she may have been entitled to some other lesser-included-offense jury instruction such as a felony-murder jury instruction, which appellant did not request at trial and which she makes no claim to on appeal. *See Contreras v. State*, 312 S.W.3d 566, 584 (Tex. Crim. App. 2010) (holding that the offense of "injury to a child" can qualify as an underlying felony in a felony-murder prosecution); *Flores v. State*, 245 S.W.3d 432, 439 (Tex. Crim. App. 2008) (determining that a defendant does not satisfy the second prong of the lesser-included-offense analysis "if there is evidence that [s]he committed an offense that is a lesser-included of the charged offense but greater than the requested lesser-included offense"); *Jackson v. State*, 992 S.W.2d 469, 475 (Tex. Crim. App. 1999) ("A murder defendant is not entitled to an instruction on the lesser included offense of aggravated assault when the evidence showed [her], at the least, to be guilty of a homicide.").

[21] We note that it is possible that a rational jury could find from the State's evidence that appellant did not knowingly cause Mariah's death and intended to cause only serious bodily injury to Mariah when she struck the fatal blows that caused Mariah's death, which arguably would raise the issue of whether appellant is guilty only of some lesser-included offense. *See Mays v. State*, 318 S.W.3d 368, 386 (Tex. Crim. App. 2010) (noting that, if any evidence, regardless of its strength or

(continued...)

In point of error nine, appellant claims that the trial court abused its discretion "in overruling the tender of Ms. Villanueva as an expert witness at guilt innocence." Appellant argues,

> The trial court erred in excluding beneficial defensive testimony, Norma Villanueva's testimony about how being a battered woman affects one's ability to give or not give a voluntary statement. This testimony was not admitted at the innocent/guilt stage. The Court will note Ms. Villanueva's [punishment-phase] testimony at (RR 37/216-18).[22] The defense summarized that testimony in the bill of exceptions at guilt/innocence. (RR 35 145)[23] The Court now should consider the importance of such testimony on the voluntariness of her statement and should order a new trial.
>
> * * *
>
> The error was not harmless beyond a reasonable doubt because the jury needed this information to decide if Ms. Lucio's statement was voluntary or not. The judge told them that they were to disregard her statements unless they were

---

[21](...continued)
credibility, raises the issue that the defendant is guilty only of the lesser offense, then the charge must be given). We believe, however, that appellant would have had to take responsibility for the fatal injuries that caused Mariah's death in order for there to be any realistic chance that the jury would have convicted her of any lesser-included offense. And with appellant having disclaimed responsibility for these injuries, we do not believe that a rational jury would have convicted her of any lesser-included offense. *See Williams*, 294 S.W.3d at 681 (deciding that defendant's testimony that she did not commit capital murder, if believed by the jurors, would have supported only an acquittal, not a conviction for the lesser-included offense of injury to a child). *But see Saunders v. State*, 913 S.W.2d 564, 572 (Tex. Crim. App. 1995) (determining that that fact that a lesser included offense is raised by the evidence but not included in the jury charge is sufficient to meet the applicable harm standard "where the jury's only options are to convict for the greater offense or acquit").

[22]
In summary, this cited portion of Villanueva's punishment-phase testimony was that appellant's "blank stare . . . at the police station" is "a classic symptom of individuals that are abused" which might explain why appellant "was not hovering" over Mariah when EMS arrived.

[23]
This cited portion of the guilt-phase record contains no proffered testimony of Villanueva at all.

convinced beyond a reasonable doubt that the statements were voluntary.[24] Had the jury had Norma Villarreal's [sic] testimony at guilt/innocence, they would have had a reasonable doubt about the voluntariness of the statements, would have disregarded them, and would not have been left with enough evidence rationally to find guilt beyond a reasonable doubt.

* * *

Had Ms. Villanueva's testimony been admitted at the guilt innocence phase of the trial, the jury could have used it to decide whether the battered woman voluntarily gave the statement at the station to the police. The judge excluded it. Trial counsel made a bill of exceptions. The essence of her testimony is that Melissa was a battered woman and would have and did tell the police whatever they wanted her to say.

We, therefore, understand appellant to claim that the trial court erroneously excluded Villanueva's proposed testimony at the guilt phase that appellant's being a battered woman affected her ability to voluntarily give a statement to the police, which the jury could have used in determining that appellant's statement to the police was involuntary as a matter of state law. *See Oursbourn v. State*, 259 S.W.3d 159, 169-76, (Tex. Crim. App. 2008) (discussing that involuntariness claims under state law "can be, but need not be, predicated on police overreaching, and they could involve the 'sweeping inquiries into the state of mind of a criminal defendant who has confessed'" which, armed with a proper "voluntariness" instruction, a jury is entitled to consider). The record reflects that Villanueva is a clinical social worker with "a master's degree in social work" and "the highest national clinical license to allow [her] to do diagnosis and treatment of mental health disorders."

---

[24] Appellant does not cite to any portions of the record where the trial court provided such an instruction to the jury. We further note that the jury charge did not contain a voluntariness instruction or any other instruction relating to appellant's recorded statement. We also note that appellant did not request a voluntariness instruction.

During a hearing on the admissibility of Villanueva's proposed guilt-phase testimony, appellant proffered Villanueva as an expert to explain "why, in fact, [appellant] would have given police officer's [sic] information in that [recorded] statement that was not correct."

[TRIAL COURT]: –and on the case in chief, I am having a hard time understanding how you can get that in.

[DEFENSE]: Well, we have heard also testimony from the Texas Ranger, that he could walk into a room and could tell by "body language" that my client wanted to make a statement. And Norma Villanueva is going to be talking about the body language of Melissa during her video statement. She's also going to be talking about the–what's happened to her and the authorities with Child Protective Services and how that has a bearing on Melissa Lucio.

[TRIAL COURT]: And I understand that with regard to punishment in terms of factors that are in litigation, I am having a hard time understanding how it affects the case in chief as to guilt or innocence.

[DEFENSE]: Judge, it goes to whether or not she–what type of personality she has. Is she an aggressive person? Is she a nonaggressive person? Whether or not she admits to things that she didn't do or did do? Whether she says one thing to men, and another to women? This is what she is going to be testifying to.

\* \* \*

[TRIAL COURT]: How does that go as to body language?

[DEFENSE]: Judge, she has seen the video.

[TRIAL COURT]: I understand.

[DEFENSE]: And she has reviewed the records, and with that–

[TRIAL COURT]: What kind of education and/or training does she have to interpret that?

[DEFENSE]: The same amount–

[TRIAL COURT]: Hold on. Just a minute. I'm sorry. With regards to the

factors of mitigation, I don't think there is any question that Mrs. Villanueva is overly qualified to testify as to that. With regards to the issue of guilt or innocence, I am having a hard time trying to figure that out. So I welcome any consideration because I do not see how Mrs. Villanueva is going to talk about things–I mean, unless she has personal knowledge of something with regards to the facts, how is she–

* * *

[DEFENSE]: Mrs. Villanueva is here to testify as to why, in fact, she would have given police officer's [sic] information in that statement that was not correct, and she's going to base that testimony on the information that she has seen from the social–

Villanueva also testified at the admissibility hearing. *See* TEX. R. EVID. 103(b) (providing for an offer of proof "in question and answer form"). After testifying to her training "that helps [her] in dealing with people and what they are trying to convey" by their body language, Villanueva testified on direct examination by the defense that "[s]everal patterns of [appellant's] behavior have emerged" based on an examination of CPS documents "especially from '04 to the present."

The State's cross-examination of Villanueva established that Villanueva apparently intended to provide some guilt-phase testimony about appellant's body language during her recorded statement.

Q. [STATE]: And as you're testifying as a mental health expert, you can sit there and look at a person just by the demeanor in the face or their body demeanor, that person is either telling you the truth, or not telling you the truth?

A. [VILLANUEVA]: Oh, no, sir, I didn't say that. What I'm saying, is, that it has to be a combination of factors. When you're judging somebody's behaviors, especially when it has to do with body language, if you do it solely on the basis–for example, if all I had done was just watch that videotape testimony, or excuse me, statement, then I shouldn't be sitting up here.

But you interview the person. You look at their background. You look at their interactions with other figures of authority. You put the whole pool of information together because you cannot know a person based on watching one DVD, or as an investigator by having them with you in that one instance, which is an instance of duress. You have to look at them across a life span.

Villanueva expanded on her proposed guilt-phase testimony upon further questioning by the defense.

Q. [DEFENSE]: And if you are allowed to testify in this particular case, you are going to testify as to what?

A. I was going to testify about three separate issues. The first issue was about patterns of behavior with Mrs. Lucio which strongly influenced her behavior during that videotaped statement process with the investigators that night.

Q. That video statement that is in evidence in this case?

A. That is correct. In support of that, I was also going to testify that the patterns of behavior as seen in the Child Protective Services records, the patterns in her family, how that influenced her decision making and how she felt with the different investigators, male and female, and also how she makes her life decisions. It influenced her behavior in that–how she felt with the different investigators male and female and how she made her decisions in answering the questions during that process. And lastly, looking at her CPS history, how–and also her social history, how she deals with different people in levels of authority, and also how that influenced her body language, and how body language is interpreted in different ways if you do not have her history of behaviours [sic] or patterns of behavior or her social history.

In excluding Villanueva's proposed guilt-phase testimony, the trial court "did not find [Villanueva] to be an expert on whether or not [appellant's] statement was true or not true, manufactured–factored, or whatever." Appellant responded by questioning Texas Ranger Escalon's expertise when he testified about his observations of appellant's body language during her recorded statement.

[DEFENSE]: Judge, the State brings in a Texas Ranger and he says: Well, body language tells me this.  And, body language tells me that.  What expertise did he have, if any?

[STATE]: He could have asked him that, Your Honor.  He was there on the witness stand and was subject to cross examination.

\* \* \*

[TRIAL COURT]: What you are asking to do is to give evidence from a person holding themselves out as an expert as to why that statement is or is not true or what was produced.  Again, I think, Mrs. Villanueva, is imminently qualified on the issue of mitigation.  But, you know, I am familiar with clinical social workers.

It is not very clear from the record exactly what Villanueva's guilt-phase testimony before the jury would have been, how that testimony would have been relevant to the voluntariness of appellant's recorded statement to the police, or upon what theory of admissibility trial counsel or appellate counsel relies.

It is not clear whether the witness was going to testify about the truthfulness of her statement to the police as proposed by trial counsel, whether she was going to testify about the effects of being a battered woman and her ability to tell the police whatever they wanted her to say, as claimed by appellate counsel, or whether she was going to testify about body language and patterns of behavior as actually stated by the witness in the admissibility hearing.  Therefore, appellant's claim on appeal as to what Villanueva's testimony would have been does not comport with Villanueva's proffered testimony at trial.  *See Dixon v. State*, 2 S.W.3d 263, 265 (Tex. Crim. App. 1998) (noting that, to preserve error for appellate review, the point of error on appeal must comport with the objection at trial).  On this record, we decide that appellant failed to preserve the claim that she raises on appeal.

We also believe that Villanueva's guilt-phase testimony that was actually proffered had little, if any, relevance to a jury's voluntariness determination under state law. *See Oursbourn*, 259 S.W.3d at 172-73 ("Under Articles 38.21 and 38.22 and their predecessors, fact scenarios that can raise a state-law claim of involuntariness (even though they do not raise a federal constitutional claim) include the following: (1) the suspect was ill and on medication and that fact may have rendered his confession involuntary; (2) the suspect was mentally retarded and may not have 'knowingly, intelligently and voluntarily' waived his rights; (3) the suspect 'lacked the mental capacity to understand his rights'; (4) the suspect was intoxicated, and he 'did not know what he was signing and thought it was an accident report'; (5) the suspect was confronted by the brother-in-law of his murder victim and beaten; (6) the suspect was returned to the store he broke into 'for questioning by several persons armed 'with six-shooters.'") (footnotes omitted). We, therefore, cannot conclude that the trial court abused its discretion to exclude Villanueva's proposed guilt-phase testimony for "voluntariness" purposes.

We further decide that any error in excluding this evidence, which, at best, may have been marginally relevant to the issue of the voluntariness of appellant's recorded statement, was harmless. *See* Tex. R. App. P. 44.2(b) (providing that appellate courts must disregard non-constitutional errors that do not affect substantial rights). Point of error nine is overruled.[25]

---

[25]

(continued...)

In point of error ten, appellant claims that the trial court "erred in excluding beneficial defensive testimony, Dr. Pinkerman's testimony that since she was an abused woman she would agree with anything a policeman would say." The record reflects that the trial court would not permit Dr. Pinkerman, who is a clinical psychologist, to testify at the guilt phase. Appellant represented to the trial court that Pinkerman would provide the following guilt-phase testimony:

> [DEFENSE]: Part of his testimony is that Mrs. Lucio has all of the signs of being a battered woman. And as a battered woman, she takes blame for everything that goes on in the family. And if dealing with a male figure such as a husband she doesn't find fault with anything that a husband does, she takes the blame for it. She takes the blame for everything that goes on in the house.

We believe that the record reflects that Pinkerman was not, as appellant claims on appeal, offering any guilt-phase testimony that, "since she was an abused woman [appellant] would agree with anything a policeman would say." Dr. Pinkerman actually testified that he intended to provide the following guilt-phase testimony:

---

[25](...continued)

We further note that it appears that appellant may have intended to use Villanueva's testimony to respond to Escalon's testimony that appellant's body language during her recorded statement indicated to him that she "did it" and that she was "hiding the truth." It appears that Villanueva may have intended to testify that appellant's body language did not so indicate. The exclusion of any such testimony for this purpose would have been harmless in light of appellant's subsequent admission during her recorded statement that she abused Mariah, followed by her demonstrating such abuse with the doll. In light of this, any importance of Escalon's testimony about appellant's body language was greatly diminished and rendered harmless the exclusion of any testimony by Villanueva to respond to this evidence. And to the extent that Villanueva may have intended to testify that appellant may have been telling the truth when she initially denied abusing Mariah, this testimony would not have been admissible for this purpose. *See Yount v. State*, 872 S.W.2d 706, 708-09 (Tex. Crim. App. 1993) ([D]irect testimony as to a witnesses' credibility is inadmissible under [TEX. R. EVID.] 702 because it does not concern a subject upon which the testimony of an expert would *assist* the trier of fact").

Q. [DEFENSE]: And your testimony during the guilt and innocence stage would be what? What were you going to be testifying to in the guilt or innocence stage?

A. [PINKERMAN]: On the basis of my review of information, consultation with additional experts, and the evaluation that I have done with the defendant Mrs. Lucio, I was going to testify about the characteristics and makeup of her psychological functioning. I was also going to address how her demeanor, both immediately after the incident and during the interrogation, may be understood by understanding and appreciating the psychological functioning. I was also going to address how her demeanor, both immediately after the incident and during the interrogation, may be understood by understanding and appreciating the psychological elements and previous history and background that she has lived through. I was also going to address the notion of how difficult it might have been for her to step into some of the treatment, even though it was minimally offered. And those are the highlights.[26]

Therefore, appellant's claim on appeal as to what Pinkerman's testimony would have been does not comport with Pinkerman's proffered testimony at trial. *See Dixon*, 2 S.W.3d at 265. Nor does it comport with what the trial attorney claimed that he was offering it for. On this record, we decide that appellant failed to preserve the claim that she raises on appeal.

We also believe that Pinkerman's proffered guilt-phase testimony had little, if any, relevance to a jury's voluntariness determination under state law. *See Oursbourn*, 259 S.W.3d at 172-73. We, therefore, cannot conclude that the trial court abused its discretion to exclude

---

[26] The State argues,

> The offer of proof herein is broad and general and refers to subjects such as "the characteristics and makeup of [Appellant's] psychological functioning," and Appellant's "demeanor." These broad categories fail to demonstrate how this evidence is relevant to Appellant's case at guilt/innocence; but beyond that, these categories do not give this Court sufficient information to determine how the exclusion of this evidence would have been harmful.

this testimony for "voluntariness" purposes. We further decide that any error in excluding this evidence, which at best may have been marginally relevant to the issue of the voluntariness of appellant's recorded statement, was harmless. *See* Rule 44.2(b). Point of error ten is overruled.

In point of error four, appellant claims that the evidence is legally insufficient to support the jury's affirmative answer to the future-dangerousness special issue under this Court's decision in *Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007).[27] In *Berry*, the evidence showed that the defendant murdered her new-born infant by suffocating him and that the defendant attempted to murder another new-born infant five years later by abandoning her in a remote location where it was unlikely that she would have been found alive. *Id.* at 863-64. This Court decided that the evidence was legally insufficient to support the jury's affirmative answer to the future-dangerousness special issue because a jury could not rationally find that the defendant was dangerous to anyone other than her own new-born children, which the defendant, if assessed a parole-eligible life sentence, would not have during her child-bearing years in prison and which she would not bear or give birth to if she was ever released from prison on parole after her child-bearing years. *Id.* at 863-64.[28]

---

[27]

The future-dangerousness special issue asks a jury to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1).

[28]

The applicable law in *Berry* provided that a life-sentenced capital defendant's minimum parole eligibility was 40 years. In 2005, the Legislature amended Article 37.071 to provide that a

(continued...)

Appellant appears to argue that the evidence is legally insufficient under *Berry* to support the jury's affirmative answer to the future-dangerousness special issue because this evidence shows that she is dangerous only to her own children, which appellant would not have access to if she was sentenced to life without parole and spent the rest of her life in prison. We understand appellant to argue that *Berry* and the 2005 life-without-parole legislative amendments to Article 37.071 should be read to support construing the statutory future-dangerousness special issue to ask a jury to determine whether a capital defendant sentenced to life without parole would be dangerous only in prison society.

We have rejected such a reading of *Berry* as being inconsistent with prior case law construing the statutory future-dangerousness special issue to ask a jury to determine whether a capital defendant would be dangerous "whether in or out of prison" without regard to how long this defendant would actually spend in prison if sentenced to life. *Martinez v. State*, 327 S.W.3d 727, 735 (Tex. Crim. App. 2010); *Estrada v. State*, 313 S.W.3d 274, 280-82 (Tex. Crim. App. 2010), *cert. denied*, 178 L.Ed.2d 760 (2011).[29] We reaffirmed this prior case law in *Estrada*, 313 S.W.3d at 284, and then again six months later in *Martinez*, 327 S.W.3d at 735. Today, we once more affirm *Estrada*, *Martinez*, and the prior case law upon which they

---

[28](...continued)
life-sentenced capital defendant would no longer be eligible for parole. *See, e.g.,* TEX. CODE CRIM. PROC. art. 37.071, § 2(g); *see also* Acts 2005, 79th Leg., R.S., ch. 787, §§ 7, 8, 9, page 2706 (SB 60), eff. September 1, 2005.

[29]
The future-dangerousness special issue, therefore, does not entirely involve a prediction of future behavior. *Estrada*, 313 S.W.3d at 281 n.5.

relied.[30]

Further, *Berry* is distinguishable from this case. In *Berry*, the defendant was charged with having asphyxiated her new-born baby, who was between two and five days old, and there were no allegations that the defendant had terrorized the victim over an extended amount of time. We held that the defendant was dangerous to only some, but not all, of her own newborn children, which she would not likely have during her child-bearing years in prison, so the jury could not rationally find that the defendant was a future danger. In contrast to *Berry*, the evidence in this case supports a finding that appellant is dangerous to a broader range of potential victims both inside and outside of prison. The evidence demonstrates that the abuse against the victim was not a one-time event; rather, over the course of *several* weeks or months, the victim suffered from a broken arm, scrapes, bite marks on her back, pinches

---

[30] We further note that, prior to our decision in *Berry*, the Legislature amended Article 37.071 in 2005 to provide for a life-without-parole sentencing option. We have found nothing in the legislative history of the 2005 life-without-parole amendments to Article 37.071 to indicate that the Legislature intended to change then-existing case law holding that the future-dangerousness special issue asks a jury to determine whether a defendant would be dangerous "whether in or out of prison." Representative Goolsby, one of the sponsors of a life-without-parole companion House Bill (HB 284) to Senate Bill 60, explained during one legislative hearing that the life-without-parole provisions changed nothing "with respect to the special issues." Hearings on SB 60 before the House Criminal Jurisprudence Committee, 79th Leg., R.S. (www.house.state.tx.us, House Criminal Jurisprudence Committee Archived Committee Broadcasts at 0:17:31-0:24:20, April 19, 2005). Representative Goolsby explained that "no aspect of the death-sentence process" was meant to be changed by the life-without-parole provision except to give jurors this sentencing option while still answering the "well-established" special issues. *Id.* Representative Goolsby further explained that the life-without-parole provision was not meant to present anything new to appellate courts because all of the special issues remained the same. *Id.* Our decision in *Estrada* also noted that the 1999 amendments to Article 37.071, which first authorized the submission of a minimum parole-eligibility jury instruction at the defendant's request, were not intended to change this prior case law either. *Estrada*, 313 S.W.3d at 282 n.6.

in her vaginal area, contusions to the lungs and kidneys caused by punches or stomps, pulled hair, dehydration, bruises over an extensive area of her body, and blunt force trauma to the head. Two doctors described the death as the worst case of child abuse that they had seen.

Additionally, the evidence shows that the mistreatment of the victim was not an isolated incident. The record reflects CPS's "extensive history" with the family.[31] In fact, CPS had previously removed *all* of appellant's children from her possession due to its concern for the children's safety, and the CPS report documented the bruises, scratches, scabs, bites, and general filth of at least five of appellant's children. In her September 22, 2004 affidavit, which led to the subsequent removal of the children, CPS specialist De La Garza stated, "It was determined that it would be in the best interest of the children to be placed in protective custody due to poor physical conditions of the children and the home, the lack of food in the home, the neglectful supervision of the children, past and present drug use, previous CPS history and no viable voluntary placements for the children." She concluded, "Based on the facts above, I believe there is an immediate danger to the physical health or safety of the

---

[31]

CPS specialist De La Garza described the Department's "extensive history" with the family:

In June 1998 a report for, [sic] neglectful supervision was ruled out. In November 2000, *physical abuse of Gabriel by his mother was validated as reason to believe*, after both Ms. Lucio and Gabriel tested positive for cocaine. In December 2001, physical neglect allegations were ruled out. In May, 2002, neglectful supervision was ruled unable to determine against Ms. Lucio, and ruled out as to as to [sic] Robert Alvarez. In June, 2003, physical abuse was found unable to determine, and an additional report for neglectful supervision was validated that same month. The family was referred for services through the Department. In January 2004, neglectful supervision was again validated and services were provided.

(Emphasis added).

child/children and that there is no time, consistent with the physical health or safety of the children for an adversary hearing."

Also in contrast to *Berry*, the evidence here indicated a history of drug use by appellant as well as a DWI conviction. And while incarcerated, appellant received several disciplinary violations for fighting with and having verbal disagreements with other inmates, possession of contraband, unauthorized communication with another person, and being disrespectful to a guard.

Therefore, in reviewing the legal sufficiency of the evidence to support the jury's affirmative answer to the future-dangerousness special issue, we view the evidence in the light most favorable to the jury's answer to this special issue and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would constitute a continuing threat "whether in or out of prison." *Estrada*, 313 S.W.3d at 281-82 and at n.5 and at 284. When we consider the evidence reflecting that appellant brutally murdered her defenseless two-year-old child, which was preceded by appellant abusing and brutalizing this child over the course of approximately two months, combined with the previous removal by CPS of all of appellant's children from her home and the evidence of appellant's misbehavior in the county jail, we believe that the evidence is sufficient to support the jury's affirmative answer to the future-dangerousness special issue. The brutality of, and circumstances leading to, this offense particularly support an affirmative answer to this special issue. *Druery v. State*, 225 S.W.3d 491, 507 (Tex. Crim. App. 2007)

(stating that "circumstances of the offense itself can be among the most revealing evidence of future dangerousness and alone may be sufficient to support an affirmative answer to that special issue" (internal quotes omitted)).  On this record, we cannot conclude that it would be irrational for a jury to find beyond a reasonable doubt that there is a probability that appellant would constitute a continuing threat to society "whether in or out of prison."  Point of error four is overruled.

In point of error one, appellant claims that this Court should remand this case to the trial court to determine whether "the proof has failed on future dangerousness" since, according to appellant, the trial court did not "think" that it had "discretion to determine that the proof has failed on future dangerousness."  The record reflects that, during the sentencing hearing after the jury had returned its punishment verdict and before the trial court signed its judgment, the trial court declined appellant's request to enter a judgment of life in prison "because of the Barry [sic] case."

> [DEFENSE]: Judge, I would ask the Court–because of the Barry [sic] case, I would ask the Court to re-think this and enter a judgment of life in prison without parole.

> [TRIAL COURT]: I've reviewed the Barry case, and I've reviewed the statute on this.  I don't think I have any discretion.  I think this case is going to ultimately show that absent a history of violence, if there is a crime that is so heinous, that it is enough to warrant death in spite of Barry.  I think it's going to focus it to the Court of Criminal Appeals, but I don't think I have discretion.

Appellant essentially asked the trial court to enter a judgment notwithstanding the verdict.  A trial court has no such authority in a criminal case.  *See State v. Savage*, 933

S.W.2d 497, 498 (Tex. Crim. App. 1996); *see also* TEX. CODE CRIM. PROC. art. 42.01, § 1(7) (requiring trial court's judgment to reflect the verdict or verdicts of the jury); TEX. CODE CRIM. PROC. art. 37.071, § 2(g) (providing that "the court shall sentence the defendant to death" if the jury affirmatively answers future-dangerousness special issue and negatively answers mitigation special issue). In addition, having decided in point of error four that the evidence is legally sufficient to support the jury's affirmative answer to the future-dangerousness special issue, we do not believe it necessary to remand this case to the trial court to determine whether "the proof has failed on future dangerousness." *See Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996) (stating that an appellate court treats a point of error complaining about a trial court's failure to grant a motion for directed verdict as a challenge to the legal sufficiency of the evidence). Point of error one is overruled.

In point of error eight, appellant claims that the evidence is factually insufficient to sustain a finding of future dangerousness. We do not review the factual sufficiency of the evidence to support a jury's answer to the future-dangerousness special issue. *Brooks*, 323 S.W.3d at 895; *Hunter v. State*, 243 S.W.3d 664, 672 (Tex. Crim. App. 2007).[32] Point of error

---

[32]Appellant filed a Motion that the Court Conduct the Factual Sufficiency Reviews Noted in Appellant's Brief on January 13, 2011. This Court took no action. However, because there was no factual sufficiency review right to begin with, according to the Court, logically then *Brooks* should not be applied retroactively to all cases on appeal. It would also be illogical to give a factual sufficiency review to other cases on direct appeal when Brooks, in the end, did not get a factual sufficiency review. All appellants must be treated equally. Further, the retroactivity situation here is similar to the change in the harm analysis for statutory violations when Rule 44.2(b) was enacted. In *Fowler v. State*, 992 S.W.2d 258, 261 (Tex. Crim. App. 1999), we held that "[t]he procedural mechanisms for reviewing that conviction are not a vested and substantive

(continued...)

eight is overruled.

In point of error five, appellant complains about the admission into evidence of "a conviction for dwi without a lawyer or a jury." Appellant's brief states,

> Counsel represents to the Court of Criminal Appeals that the dwi conviction and sentence are the subject of a current application for post-conviction writ of habeas corpus pursuant to TEX.R.CRIM.P.art. 11.09, averring that the waivers of counsel and jury were not fully informed and thus not voluntary, and further that the conviction has serious collateral consequences, since the state used the dwi conviction at the capital murder trial.

> The application is pending in the County Court at Law No. 3 of Cameron County. I know that because I filed it.

> I include these averments in this brief for convenience and clarity. By separate motion to take judicial notice, I formally ask the Court to take judicial notice of those pending proceedings.

> The pending application states: She was convicted while she was in jail charged with the instant offense. She had no lawyer for the capital offense or for the dwi. She and five others were taken from jail to the County Court at Law Number Three of Cameron County, waived lawyers and a jury, given 180 days in jail, and returned to jail, all in the space of minutes.[33]

Appellant complains on appeal of the admission into evidence of her DWI conviction during the State's cross-examination of defense witness Villanueva at the punishment phase.

Q. [STATE]: Did you inquire, Mrs. Villanueva, into the criminal history of

---

[32](...continued)
right." Though it could be argued that a factual sufficiency review provided a substantive right, it is more akin to a procedural right because the relief granted in those cases was a new trial, as opposed to an acquittal.

[33]
The State's notices of extraneous offenses indicate that appellant committed the DWI offense on September 15, 2006, and that she was convicted of this offense on May 16, 2007, while she was incarcerated in the county jail on this capital-murder charge.

Mrs. Lucio?

A. [VILLANUEVA]: I remember that it was discussed at the very first meeting.

Q. Okay. Did you learn that she had a DWI conviction?

A. I recall something like that, yes, sir.

Appellant failed to object to the admission of this testimony. Appellant, therefore, failed to preserve any error in its admission, and she has not presented any other basis for this Court to grant appellate relief as a result of the admission of this evidence. Point of error five is overruled.

In point of error twelve, appellant claims that the trial court erroneously admitted "the notes of the social worker, Beto Juarez, . . . of his interview of Ms. Lucio while she was in custody." In point of error thirteen, appellant claims that the trial court erroneously admitted "Ms. Lucio's statements to Beto Juarez." The record reflects that appellant called CPS caseworker Estrada as a defense witness at the guilt phase. Appellant elicited testimony from Estrada that, after the charges in this case had been filed, Juarez had been "performing some sort of counseling" with appellant pursuant to an order from a "CPS court" after appellant's twins were born in October 2007. The "CPS court" ordered "parenting classes, individual counseling, and visitations with the twins" even though CPS was in the process of terminating appellant's parental rights to her children. Juarez was a therapist, who worked "under contracted services" with the CPS and who provided therapeutic services to appellant in the county jail between February 2008 and May or June 2008. Appellant's counsel apparently

was not present during any of these counseling sessions.

Villanueva and Pinkerman testified on direct examination by the defense at the punishment phase that appellant had been physically and sexually abused from the age of fourteen. Referring to Juarez's notes, the State impeached their testimony on cross-examination by pointing out that appellant made no such claim of abuse during the counseling sessions with Juarez.

We understand appellant to claim that counsel should have been present during Juarez's counseling sessions with appellant and that the State's use of information from these counseling sessions to impeach the punishment-phase testimony of Villanueva and Pinkerman violated appellant's Sixth Amendment right to counsel, her Sixth Amendment right to be confronted with the witnesses against her, and possibly several other constitutional rights. Appellant argues that the State's use of this information undermined her claim at the punishment phase that she had been physically and sexually abused. Appellant argues on appeal,

> Had counsel been present at the "counseling" sessions, he could have told Ms. Lucio to say nothing. To protect her rights to a fair trial on the issue of future dangerousness, he could have told her not to say anything about prior sexual and physical and verbal abuse or not to be embarrassed to admit it. Since this abuse was a significant part of her "defense" in court, counsel's absence, and Juarez' gathering of knowledge from Ms. Lucio, affected Ms. Lucio's right to a fair trial and to the assistance of counsel.
>
> * * *
>
> Melissa's "defense" was that she was sexually and physically and verbally abused from age 14. Beto Juarez said she told him she was not. The jury knew that a "No" answer [to the mitigation special issue] meant death because the judge told them so. They answered "No". Admitting Juarez' evidence might

have prejudiced the jury's consideration of the other evidence. Indeed, it surely did, since Juarez' evidence directly contradicted Melissa's evidence on sexual and other abuse and the jury answered "No" on the mercy question.

We set out the portions of the record relevant to these points of error. The punishment-phase record reflects the following during the State's cross-examination of Villanueva.

> [STATE]: [State's] Exhibit 44 are therapy notes prepared in this case that provided part–
>
> * * *
>
> The documents are therapy notes prepared for Mrs. Lucio by the gentlemen [sic] . . . and those are just his notes concerning the interview with the defendant. I'm going to offer it.
>
> [TRIAL COURT]: What's the objection?
>
> [DEFENSE]: It's hearsay. It's all part of the record. What do I do? Bring in the entire set of records that I've got from Child Protective Services, and then the Court didn't allow the book to go in.
>
> * * *
>
> [TRIAL COURT]: I'm going to sustain the objection to the motion on hearsay.

The trial court again sustained appellant's hearsay objection to the admission of State's Exhibit 44 when the State offered this exhibit later on during its cross-examination of Villanueva.

> Q. [STATE]: Well, do you recall in your review of the summaries back in March of this year that Mrs. Lucio denied ever being sexually abused as a child?
>
> A. [VILLANUEVA]: That was not in the summaries.
>
> Q. So if you had called Mr. Juarez and asked him about that, would that have changed your opinion in this case?
>
> A. It would have made me delve deeper.

Q. Okay. And you saw--

[STATE]: At this time I offer the report, Your Honor.

[DEFENSE]: Again, I'm going to object. Judge, Mr. Juarez isn't here. There's a number of different dates.

[TRIAL COURT]: What's the legal objection?

[DEFENSE]: It's hearsay.

[TRIAL COURT]: Sustained.

Q. [STATE]: So if Mr. Juarez is told by Mrs. Lucio that she had not been sexually abused as a child, how would that have changed your opinion?

A. It would have made me delve deeper.

Q. So what you are telling me is that your opinion is based on insufficient evidence; isn't that correct?

A. That's incorrect.

The punishment-phase record reflects the following during the State's cross-examination of Pinkerman.

Q. [STATE]: Doctor, are you aware of the defendant meeting with a Jesus Juarez?

A. [PINKERMAN]: I don't recall the name.

Q. Or the therapist while she was incarcerated?

A. I heard that she had contacts with someone.

Q. Did you review any of the notes?

A. No, sir.

Q. Did you discuss anything with Mr. Juarez?

A. No.

Q. Would it surprise you to learn that in February of this year–

[DEFENSE]: Objection, Your Honor. And I want them to be asking about notes from somebody else that is not even here appearing in court [sic].

[TRIAL COURT]: Is your objection as to the admission of that document on a hearsay basis?

[DEFENSE]: Yes, sir.

[TRIAL COURT]: Sustained. (Court Reads Monitor) "However, would it surprise you to learn that." That's proper cross-examination.

Q. [STATE]: Would it surprise you to know that in February of 2008 in her history to him, she claimed no physical or sexual abuse?

A. No, it wouldn't.

Q. Why is that?

A. As I said in some of my previous statements, she has a history of being very suspicious and distrustful. She obviously hasn't had the opportunities to develop that kind of a trusting relationship with the agency and with maybe him.

* * *

Q. You don't think that it would be the defendant changing her story once she figures out that it is to her benefit to claim physical and sexual abuse?

A. I'm sorry. I don't think what? I'm not trying to be–I'm just–I'm losing it.

* * *

Q. The question I'm asking: Is it a possibility that she would say one version and then change the version in order to help herself in this trial?

A. Yes, sir.

This record reflects that Juarez's notes were not admitted into evidence as appellant

seems to claim in point of error twelve.[34]  This record also reflects that appellant objected only to the admission of Juarez's notes (State's Exhibit 44).  She made no objection to the State using this information to impeach Villanueva and Pinkerman.  To the extent that  appellant may have objected to the State using this information for impeachment purposes, she objected only on the basis of hearsay.  Her objections in no way alerted the trial court to any claim that the State's use of this information violated her Sixth Amendment right to counsel, her Sixth Amendment right to confront the witnesses against her or any other of her constitutional rights.  Appellant, therefore, failed to preserve these claims for appellate review.  *See* Rule 33.1(a).  Points of error twelve and thirteen are overruled.

In point of error fourteen, appellant claims that the State's "failure to comply timely with the trial court's order on discovery denied Ms. Lucio her liberty and her life without due

---

[34]

Juarez's notes (State's Exhibit 44) are not part of the appellate record.  We do note that a defense exhibit that was admitted into evidence at the punishment phase as Defendant's Exhibit 25 contains a "CPS Case Timeline," which contains references to Juarez's counseling sessions with appellant.  This exhibit was compiled by the district attorney's office based on CPS records.  This exhibit recites that appellant's first counseling session with Juarez was on February 14, 2008, during which appellant stated that Mariah "fell down the stair from their 2nd story apartment and died." This exhibit also recites that appellant's second counseling session with Juarez was on March 5, 2008, during which appellant "still claim[ed] that child's death was an accident."  This exhibit recites that appellant's third counseling session with Juarez was on March 14, 2008, and it refers to appellant's fight with "another jailed inmate" and "scratches on [appellant's] face" and it further recites that appellant "*now* claims that her stepdad sexually abused her when she was 7 years old." This exhibit also recites that during appellant's fifth counseling session with Juarez on April 10, 2008:

> [Appellant] goes into detail of the day of child's "accident": she say that after her child fell, she was still awake and nothing really seemed wrong with her, so instead of getting her to the hospital, she wanted to not say anything because she was afraid that if she told her husband, he would attack her verbally (saying she was not a good mother)[.]

process of law." Appellant's argument in this point focuses on the timeliness of the disclosure of Juarez's notes, which is the subject of points of error twelve and thirteen. Appellant argues,

> Ms. Lucio's "defense" to future dangerousness was that she had been sexually abused and physically abused since the age of fourteen. Beto Juarez' notes, used to cross-examine defense witnesses, said that Ms. Lucio denied such abuse. Had the defense had the material in advance of trial, it could have prepared for this adverse evidence.

The record reflects that on Wednesday, June 25, 2008, the trial court ordered the State to produce copies of CPS records "that had not been produced yet from February [of 2007] on." Appellant replied that the defense would be ready to go to trial the following Monday if it received the CPS records no later than the following day. Trial began on Monday, June 30, 2008, without any objection from appellant that she had not had sufficient time to review the CPS records.

Appellant's brief does not cite to any portion of the record showing that she objected to the timing of the State's production of the CPS records. Nor have we been able to locate a portion of the record where appellant made such an objection. We also note that the portions of the record set out in our discussion of points of error twelve and thirteen indicate that appellant made no objection that the State had not timely produced the CPS records, particularly Juarez's notes. We decide that appellant has not preserved any claim that the State failed to timely produce the CPS records. *See* Rule 33.1(a). Point of error fourteen is overruled.

The judgment of the trial court is affirmed.

Hervey, J.

Delivered: September 14, 2011

Publish