

# IN THE
# TENTH COURT OF APPEALS

_____

## No. 10-11-00072-CR

**JOHN DEWAYNE FORD,**

                                                                **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                                                **Appellee**

_____

### From the 54th District Court
### McLennan County, Texas
### Trial Court No. 2010-574-C2

_____

## MEMORANDUM  OPINION

_____

John Dewayne Ford was convicted of the offense of capital murder and

sentenced to life in prison.  TEX. PENAL CODE ANN. § 19.03 (West 2011).  He appeals.

Because the evidence is sufficient to support Ford's conviction and to support the jury's

rejection of Ford's claim of self-defense, the trial court's judgment is affirmed.

### SUFFICIENCY OF THE EVIDENCE

Ford raises two issues on appeal:  1) the evidence was insufficient to prove he

committed capital murder because the State did not rebut Ford's claim of self-defense

and no rational jury could have found against his claim; and 2) the evidence was insufficient to prove Ford intentionally caused the death of Gerald Douglas Eaton and Stacy Wayne Coleman.

*The Offense*

Ford was charged with committing capital murder. As alleged in the indictment, a person commits capital murder if the person commits murder and the person murders more than one person during the same criminal transaction. TEX. PENAL CODE ANN. §19.03(a)(7)(A) (West 2011). For the purposes of committing capital murder, a person commits murder if he intentionally or knowingly causes the death of an individual. *Id.* § 19.02(b)(1).

Ford, however, claimed he committed the offense in self-defense. A person is justified in using deadly force against another when and to the degree the person reasonably believes that deadly force is immediately necessary to protect the person against the other's use or attempted use of unlawful deadly force. *See id.* § 9.32(a)(2)(A) (West 2011). The self-defense provisions in the Penal Code focus on the actor's motives and on the level of force used. *See Alonzo v. State*, PD-1494-10, ___ S.W.3d ___, ___, 2011 Tex. Crim. App. LEXIS 1181, *11 (Tex. Crim. App. Sept. 14, 2011). If the actor reasonably believes that the force was necessary to protect himself against another's unlawful use of force, and the amount of force actually used was permitted by the circumstances, the self-defense provisions apply. *See id* at *11-12.

*General Sufficiency Standard of Review*

The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, No. AP-76,020, ___ S.W.3d ___, ___, 2011 Tex. Crim. App. LEXIS 1222, *43-44, 2011 WL 4347044, *16 (Tex. Crim. App. Sept. 14, 2011).

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). And if the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson v. Virginia*, 443 U.S. 307, 326, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Further, direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to

establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Finally, it is well established that the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

### *Self-Defense Standard of Review*

Regarding self-defense, the State bears a burden of persuasion, but not a burden of production. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). That is, the State need not produce evidence rebutting a self-defense claim; it must only prove its case beyond a reasonable doubt. *Id.* In resolving a sufficiency of the evidence issue, we look not to whether the State presented evidence which rebutted a defendant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense, in this case capital murder, beyond a reasonable doubt and also could have found against appellant on the self-defense issue beyond a reasonable doubt. *Id.* at 914. A jury verdict of guilty is an implicit finding rejecting a defendant's self-defense claim. *Id.*

Because we must determine whether any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt as well as whether any rational trier of fact would have found against Ford on the self-defense issue beyond a reasonable doubt, Ford's two issues will be discussed together.

*Evidence*

Eaton owned a building that at one time was a printing business. When the business closed, Eaton kept the building and used it for storage as well as a place to hang out. Coleman lived in a makeshift apartment in the building. Ford knew both Eaton and Coleman and lived in a garage apartment behind Eaton's house for a time. Ford was also a drug dealer and supplied Eaton and Coleman with methamphetamine.

After Ford was arrested for possession of methamphetamine and possession of a firearm and bonded out of jail, a friend of Eaton's, "Painter Bob," suggested that because Ford still had a warrant outstanding for a parole violation, Eaton should not let Ford stay in Eaton's garage apartment. Consequently, Eaton asked Ford to leave, and Ford complied. Bob helped Ford move his belongings—some to Eaton's building and some to Ford's girlfriend's place.

After he moved out of Eaton's garage apartment, Ford occasionally stayed at Eaton's building. Marla Ketchum, Coleman's former sister-in-law, also occasionally stayed at the building. Coleman would take Marla to her job at a bar and bring her back to the building at closing time. While both were staying at the building, Marla and Ford began to have a sexual relationship which upset Coleman.

On the day of the shooting, Eaton and Coleman arrived at the building. Marla and Ford were already there. Coleman and Marla decided to go to a local grocery store to get some snacks and beer. When they returned, Coleman went outside to try to hook

up propane for the building. Inside, Ford and Eaton were having a serious conversation. Marla heard Eaton tell Ford that Ford, Coleman, and Marla were going to have to leave. Ford refused. Marla also heard Eaton ask Ford either why Ford could not fight with his hands or why Ford could not fight like a man. Ford pulled out a handgun. Eaton threw up his hands, told Ford he was finished with him, and walked outside. Eaton and Coleman then left. Ford was angry and threatened to tear up everything in the building. Marla, however, calmed him down.

Meanwhile, Eaton and Coleman went to Bryan Blagg's house. Eaton relayed the events to Blagg who told Eaton that if Ford had pulled a gun on Blagg, Blagg would still be there beating on Ford. Coleman then asked Blagg for a shotgun but Eaton told Coleman they did not need one and to follow Eaton's lead.

Eaton and Coleman returned to the building. Marla thought they returned in a much better mood. Eaton went outside to relieve himself and returned saying that Blagg had arrived. He then put Ford in a headlock and started hitting Ford in the head. Eaton told Coleman to grab Ford's feet and grab the gun. Eaton said that they were going to get Ford out of the building. Coleman grabbed Ford's feet, and as Coleman reached for Ford's midsection, Ford pulled his gun and started firing. He then backed out the side door where he encountered Blagg. Ford pointed the gun at Blagg and then took Blagg's pickup and left the scene.

Coleman was shot in the chest and died at the scene. Eaton was shot in the abdomen and died at the Emergency Room. Ford later called police and directed them to his location where Ford was arrested.

Ford testified in his own defense. He admitted that he was in violation of his parole when he was arrested for possession of methamphetamine and in possession of a firearm. After he was bonded out by his drug supplier, Ford knew he still had an outstanding warrant for parole violations.

Ford further testified that he had been paying rent to Eaton to stay at the building.

Ford said that on the evening of the shooting, Eaton was upset because of Ford's relationship with Marla and told Ford that either Marla had to leave or everyone would have to leave. Ford explained that Coleman was the one who brought Marla to the building. According to Ford, Eaton appeared as if he wanted to fight Ford, so Ford pulled the gun on Eaton. Eaton and Coleman left but returned a short time later. Eaton then grabbed Ford from behind and instructed Coleman to grab Ford's feet. Ford stated that fearing for his life, he picked up his gun from between the couch cushions where Ford was laying and began firing it to get Eaton and Coleman off of him. Ford agreed that neither Eaton nor Coleman were displaying any weapons. After shooting Eaton and Coleman, Ford ran out the side door and saw Blagg. Ford thought he saw a shotgun near Blagg and left in Blagg's pickup.

Ford testified that Eaton and Coleman were part of the Aryan Brotherhood and knew their reputation for beating people. He also testified that it would not have mattered if Eaton and Coleman were Aryan Brotherhood or boy scouts; Ford would have shot any grown person attacking him.

On rebuttal, several witnesses, including a lieutenant employed by the Texas Department of Criminal Justice and assigned to an FBI violent crime task force, testified that Eaton and Coleman were not members of the Aryan Brotherhood or the Aryan Circle. Eaton's wife also testified that Ford was not paying rent to stay at the building. Further, Ford's former girlfriend testified that Ford was trigger-happy; that he would rather shoot someone than beat someone up or get beat up.

### *What this Case Is and Is Not*

This is not a case in which Ford was simply hanging out with friends when two of those friends jumped on him and started beating on him. In such a scenario, self-defense takes on an entirely different meaning. In this case, the jury had a very complex social dynamic at work that had to be understood and evaluated. It has been expressed as "there are a lot of moving parts" to the relationship of these parties, the altercation, and the result.

There was no question that Ford had been told that he would have to leave the garage apartment owned by Eaton. There was some dispute as to whether Ford was going to have to leave the building or whether that was only if Marla did not leave.

There was, however, no question that Ford did not intend to leave even though Eaton, the owner of the property, according to one version of the events, had told Ford he *must* leave or that, according to other versions, Ford *may* have to leave the property.

There was also a dispute in the evidence whether Ford was paying rent. If the jury believed he was paying rent, Ford was at home. If Ford had been asked to leave by the owner, and if Ford was not paying rent, he was a trespasser. Ford's actions, by remaining at the property after being told to leave and by communicating his refusal to leave, could be viewed as a provocation of the subsequent events.

Whether Ford was a tenant or trespasser, Eaton and Coleman engaged in self-help to either physically evict or forcibly remove Ford from the property.

Ford, a convicted felon, was not authorized to be in possession of a firearm. He was. Eaton and Coleman knew Ford had the firearm.

There was evidence that Ford was Eaton and Coleman's supplier for illegal drugs.

There was also evidence that the nature of Eaton and Coleman's effort to forcibly remove Ford from the premises did not involve the use of deadly force. There were no weapons of any type used by Eaton and Coleman and the testimony was disputed as to whether Eaton did anything beyond trying to hold Ford in a head-lock and whether Coleman did anything beyond holding Ford's feet or legs.

The jury was thus presented with a vast array of testimony, much of which was conflicting, to decide whether Ford's use of deadly force was justified as self-defense. There is no question that the jury could have decided this case differently. But the question regarding self-defense that we must decide is whether, based on this record, a rational jury could have determined that Ford was not authorized to utilize deadly force to defend himself.

*Application*

Ford argues on appeal that he did not intend to kill Eaton and Coleman but that he was defending himself. There is no dispute that Ford killed Eaton and Coleman during the same criminal episode. Further, the evidence established that the handgun Ford used was a deadly weapon. *See* TEX. PENAL CODE ANN. § 1.07(a)(17)(A) (West 2011); *Jones v. State*, 944 S.W.2d 642, 647 n. 1 (Tex. Crim. App. 1996). The jury may infer Ford's intent to kill from the use of a deadly weapon. *See Jones*, 944 S.W.2d at 647. Thus, after reviewing all the evidence under the appropriate standard of review, we find that any rational trier of fact could have found the essential elements of capital murder, including whether Ford intended to kill Eaton and Coleman, beyond a reasonable doubt.

Further, in the context of all the evidence presented and as above summarized, we also find that any rational trier of fact could have found against Ford on his claim of self-defense beyond a reasonable doubt.

## CONCLUSION

Ford's first and second issues are overruled. The trial court's judgment is affirmed.

TOM GRAY
Chief Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed
Opinion delivered and filed December 21, 2011
Do not publish
[CRPM]