**AFFIRMED as Modified; Opinion Filed June 30, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-12-01703-CR**

**No. 05-12-01704-CR**

**JOHN ARTHUR RUIZ, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 1**
**Dallas County, Texas**
**Trial Court Cause Nos. F11-31859-H and F11-31315-H**

## OPINION

Before Justices Lang-Miers, Myers, and Lewis
Opinion by Justice Myers

A jury convicted John Arthur Ruiz of aggravated sexual assault of a child under the age of fourteen[1] and continuous sexual abuse of a child under the age of fourteen.[2] The trial court subsequently assessed an agreed punishment of five years in the Texas Department of Criminal Justice, Institutional Division, for aggravated sexual assault of a child, and thirty-five years' imprisonment for continuous sexual abuse of a child. In three issues, appellant argues the evidence is insufficient to support the convictions and that the evidence does not support the trial court's order in each case for Ruiz to pay court costs. As modified, we affirm the trial court's judgments.

---

[1] Appellate court cause number 05-12-01703-CR (trial court cause number F11-31859-H).

[2] Appellate court cause number 05-12-01704-CR (trial court cause number F11-31315-H).

## BACKGROUND AND PROCEDURAL HISTORY

V.R., born March 18, 1997, is appellant's biological daughter. Fifteen years old at the time of trial, she testified that she had once lived at the Fox Hollow Apartments in Grand Prairie with her older half-sister S.P., her mother, and appellant. V.R. testified that appellant started abusing her when she "was probably nine years old" and continued until she was approximately twelve years of age, and that he did so at first by touching her vagina and breasts over her clothes with his hand. She was shocked when appellant did that but feared "what would happen to me or what would happen to my family if I didn't do it his way. . . ."

V.R. testified that this abuse usually took place in the front room of the apartment. Appellant would sit next to her on the sofa while V.R. was watching television and begin touching her. V.R.'s mother was out of the house when this took place because she was caring for her parents, and S.P., who had a boyfriend and a child of her own by that point, was also not at home. V.R. testified that S.P. "was doing her own thing" because she knew "how [appellant] was" and "didn't want to be around that no more."

When V.R. was around ten years old, the abuse started to escalate. Appellant sat next to her on the sofa and touched her vagina and breasts over her clothes, then removed her shirt and unbuckled her pants and put his fingers inside her vagina. After that, he took off his pants, put his penis in her vagina, and he had sexual intercourse with her. V.R. did not say anything to appellant when he was abusing her because she was in shock and "was so scared." V.R. recalled: "It hurt. I just wanted to just cry, and cry all day, but I—I didn't want to because I was scared to do that." Although she tried to "block things out" of her memory, V.R. estimated she and appellant had sex "[p]robably like" nineteen or twenty times "at least," and that appellant put his hand or finger in her vagina "[p]robably" seventeen times. She added that she was "just estimating a guess, but I know it's not less a number." The prosecutor asked, "A lot of times,

–2–

though?", to which V.R. responded by nodding her head. The incidents typically occurred in the afternoons, after V.R. returned home from school. On one occasion, appellant went into V.R.'s bedroom, unzipped his pants, and made her put his penis in her mouth. When appellant ejaculated, the sperm landed on V.R.'s dresser.

V.R. testified that the abuse stopped when she was sent to Timberlawn Hospital following a suicide attempt, when she was approximately twelve years of age. She explained that this first suicide attempt—she testified that she "[p]robably" tried to kill herself twenty-two times—involved taking pills, and that she felt lost, abandoned, and without hope. She added that she did not believe she could tell anyone about the abuse she was suffering because she "didn't know how to tell somebody," and feared people either would not believe her or judge her if she told them what happened. While at Timberlawn, V.R. eventually developed a rapport with her therapist, Timothy Johnathan Johnson, who was the first person she told about the abuse. After V.R. outcried, Johnson called V.R.'s mother and relayed what V.R. had told him. V.R. testified that she was then approximately thirteen years of age. V.R. and her mother contacted the police.

When recalled by the defense, V.R. testified she did not remember writing a letter referenced in December 10, 2009 therapy notes from Timberlawn. V.R. did not recall telling her therapist that "she wrote that letter because her father made him [sic] angry & wanted to get back at him." The defense also asked V.R. about therapy notes from December 14, 2009, which indicated V.R. felt "sad because her [father] told her last summer that he wasn't her father," and that she felt he had "chosen his girlfriend over her."[3] V.R. admitted this statement was true, but testified on cross-examination she still loved her father because he was her "flesh and blood."

V.R.'s half-sister, S.P., born June 22, 1990, was twenty-two years old when she testified at appellant's trial. She testified that her mother, M.P. (the two girls have the same mother),

___

[3] The therapy notes are part of V.R.'s medical records from Timberlawn, which were admitted at trial.

began dating appellant when S.P. was about four years old. At that point, S.P.'s relationship with appellant was good. But their relationship began to change when S.P. was approximately eight years old. One day, while M.P. was at her parents' house, appellant started to make S.P. touch him over his clothing. Appellant made it seem like a game, grabbing S.P.'s hand and putting it over his clothes—on his penis. S.P. testified that this sort of behavior occurred more times than she could count, and that it went on for "probably about two, three years." S.P. testified that appellant threatened he "would, you know, kill us, he would take us away from my mother, you know, or he would do something to my mother that we wouldn't see her again."

S.P. testified that the abuse escalated when she was in the fourth or fifth grade, and about nine or ten years old. Appellant would put his fingers inside her pants, then inside her vagina. Appellant would also unzip his pants, pull out his penis, and make S.P. touch it. S.P. testified that appellant "would make sure that I was always right next to him" as they were watching television, and that "[h]e wouldn't let me leave his side." If S.P. wanted to leave the apartment she would first have to do "[s]omething sexual, or [appellant] would get mad and like question me on why I was leaving and who was I leaving with . . . ."

S.P. testified appellant had sexual intercourse with her for the first time in her mother's bedroom when S.P. was approximately nine or ten years old, while M.P. was not at home. S.P. could not recall how it started, but she remembered lying on her mother's bed with her clothes removed. She recollected appellant laying on top of her and that "after he was done," she went to the restroom and was bleeding from her vagina, and that she "was like scared I was going to die." She also recalled that there was "white stuff" on her stomach. Appellant told S.P. to go to the bathroom and "clean up." Asked how many times appellant had sexual intercourse with her, S.P. replied: "More than what I could count. It went on for years." She testified that the vaginal intercourse hurt at first, but "then it happened for so many years for so long, I got used to it."

–4–

S.P. also testified that the abuse usually occurred in her mother's room, but also in her room or her sister's bedroom.

S.P. recalled an occasion when V.R. and appellant's two sons (who were visiting for the summer) were at the apartment. While appellant's two sons were in the living room playing, appellant took S.P. into her bedroom, rubbed Vaseline on his penis, and had anal intercourse with her. S.P. recalled that she was nine or ten years old when this happened. Appellant leaned S.P.'s body against her bedroom door because the door did not lock. She testified that the anal intercourse "was even scarier" than the vaginal intercourse "because it . . . hurt so bad." Asked how many times appellant forced her to engage in anal intercourse, S.P. replied, "Countless times."

S.P. testified that appellant "performed oral" on her a number of times—putting "his mouth on my vagina" and moving "his tongue up and down." Appellant forced S.P. to perform oral sex on him "[c]ountless times." S.P. also recalled an occasion when appellant became angry with her over the way she had prepared his food—he preferred to eat ham with jalapenos and the jalapenos had to be sliced "exactly the way he wanted it"—and put his fingers in her vagina with jalapeno juice on them. S.P. testified that she screamed when appellant did that because "[i]t burned."

The abuse continued until S.P. was about fourteen years old. S.P. did not remember the last time appellant abused her, but she knew when it stopped. She testified: "My best friend moved into the apartments, and she was my angel. She saved me, because I made sure she was with me all the time." S.P. never told her half-sister about the abuse while it was occurring because S.P. thought V.R. was too young to understand what was going on, and S.P. did not believe appellant would abuse V.R., his biological daughter.

S.P. learned appellant had been abusing V.R. following one of her half-sister's suicide

attempts, during a meeting with Johnathan and V.R. at Timberlawn. S.P. had known that V.R. attempted suicide several times and was hospitalized, but never knew why. S.P. testified that the discovery appellant had been abusing V.R. "ripped my heart apart." She felt guilty for not reporting the abuse because she thought it might have prevented appellant from abusing V.R. Asked why she decided to finally come forward, S.P. testified:

> Because I started getting flashbacks. I never said nothing. I had dealt with it so many years my own way because it was something so horrible that I did not want it to affect my life. I had wanted to put it past me. I did not want nothing to do with it. And I knew that I had to do this for my sister.

S.P. was voluntarily committed to Timerberlawn on February 20, 2012, after she started hearing voices that told her she was a "bad person" because she did not "stand up for myself." S.P. was on Trazadone at the time of trial for Post-Traumatic Stress Syndrome, or PTSD, and Zoloft for depression. She denied that she suffered from hallucinations or delusions.

M.P., the mother of V.R. and S.P., testified that she and appellant lived together for "about 12 years or so," and that they never married. S.P. was five years old when M.P. met appellant; V.R. was born during the relationship and is appellant's biological daughter. The relationship between appellant and M.P. was volatile, and they argued frequently. M.P. explained that "[a] lot of it was control, control issues, and I didn't want to be controlled and we bumped heads with that." When V.R. was very young, M.P. would occasionally leave her alone with appellant while she was away caring for her parents. M.P. testified that V.R. was a happy, friendly child with many friends when she was young, but experienced a drastic change in behavior when she was nine or ten years old. V.R. was not going to school. She stopped socializing. She no longer had friends. S.P. went through a similar change in behavior as she grew older.

M.P. testified that V.R.'s first attempted suicide occurred when the child was ten or eleven years old—V.R. swallowed a bottle of pills. M.P. brought V.R. to Arlington Memorial

Hospital, after which she was transferred to Children's Hospital, and then to Timberlawn. V.R. was on her fourth visit to Timberlawn—she was hospitalized there nine times—when M.P. found out about the abuse. M.P. testified that she had been called to a meeting at the hospital with V.R. and her therapist, Timothy Johnathan Johnson. Expecting a routine consultation about her daughter's treatment, M.P. was shocked to learn that V.R.—who was shaking and crying and reluctant to talk about what happened—had previously made an outcry about sexual abuse committed by appellant. Shortly after that meeting, M.P. drove V.R. to the police station, where they spoke to Dallas police detective Christy Martinez.

During a subsequent meeting at Timberlawn with Johnson, at which both of her daughters were present, M.P. learned S.P. also had been sexually abused by appellant. M.P. testified, however, that S.P.'s abuse was not immediately reported to the police because she was afraid. M.P. also noted S.P. was twenty years old when she made her outcry. Eventually, M.P. persuaded S.P. to talk to the police following a pretrial hearing in V.R.'s case. When S.P. went to the police, she met with Dallas police detective Aaron Martinez.

M.P. testified that S.P. was very quiet prior to making the outcry, but afterwards her demeanor changed and "[s]he was more angry, more mad," and had "flashbacks, nightmares." She was hospitalized at Timberlawn for anxiety, depression, and for trying to hurt herself and her son. M.P. believed both of her daughters suffered from PTSD.

M.P. testified on cross-examination that she initially believed V.R.'s depression and not wanting to go to school were caused by the child's kidney problems. V.R. suffered from severe kidney problems and was, at one point, visiting the hospital emergency room three times a week because of those ailments. V.R. was homeschooled in the sixth, seventh, and eighth grades in part because she did not want to go to school. M.P. also testified that V.R. had a problem with wetting the bed. M.P. denied her daughters suffered from "audio-visual hallucinations."

Timothy Johnathan Johnson, V.R.'s mental health therapist and the program director at Timberlawn Mental Health Systems, has a master's degree in social work and is a licensed mental health therapist. He testified that V.R. was referred to him at Timberlawn's DeSoto location from the hospital's main campus in April 2010, following three previous inpatient hospitalizations at Timberlawn for suicide attempts. V.R. was originally referred to Timberlawn under the belief she was attempting suicide because of her ongoing medical condition—V.R. suffered from kidney failure and was awaiting a kidney transplant. Johnson gradually developed a rapport with V.R. On the day she was discharged, April 16, 2010, V.R. made an outcry of sexual abuse. Johnson testified that he attempted to extend her stay, but V.R. was not allowed to stay longer at the hospital "because she had maximized her time at that particular point." V.R. returned to the hospital on an outpatient basis in May, approximately one month later, and during that treatment V.R. "repeated the exact same thing she stated on the last day of her previous stay." Johnson reported V.R.'s outcry to CPS.

Johnson testified that V.R. was diagnosed with PTSD and "major depression." He explained that V.R. was having flashbacks about what happened, not hallucinating, and that "because of the prolonged trauma that she endured, she did begin to suffer flashbacks as a result of the trauma." He added that in a flashback the person is seeing something that is not necessarily there, but "it's something that did happen to you, and you're basically reliving it in your mind over and over." People sometimes "will use the term auditory/visual hallucinations when they simply mean either flashbacks or some occurrence where the child either expressed something that actually was not there, whether it be in their mind or thought process or anything like that." He testified that children who are victims of sexual abuse sometimes "mix[ ] up" the details of the abuse:

> Mainly because the abuse normally starts at a young age, and as a result of that, you have what actually occurred, and then you have the mentality of the child

which tends to create things as well as sort of add stuff to it, because they're unclear. Their memory gets mixed up, to be quite honest. They may run things together. They may also get specific details incorrect, but that doesn't necessarily mean that it didn't happen. Again, it's hard for them, especially if several years have gone by.

Regarding S.P., Johnson testified that she participated in one of V.R.'s therapy sessions. During those discussions, Johnson learned S.P. also had been abused. Because S.P. was an adult when she made the outcry, he discussed it with M.P. but did not report the outcry to the police.

Dallas police detective Christy Martinez was assigned to investigate the abuse allegations made by V.R. She testified that the case was assigned to her on May 20, 2010. The following day, she contacted V.R.'s mother to confirm the information in the offense report. Martinez then scheduled a forensic interview for V.R. at the Irving Family Advocacy Center. There was also a referral to the Reach Clinic at the Children's Hospital of Dallas for a physical exam. Martinez testified that she did not expect there to be any findings from the physical exam because of the passage of time: V.R. was fourteen years old at the time of the forensic interview and stated in the interview she was last abused just before her twelfth birthday. Following the physical exam, which was inconclusive,[4] Martinez obtained a written statement from Johnson regarding V.R.'s outcry. Martinez then obtained a warrant for appellant's arrest. She interviewed appellant for approximately fifty-seven minutes on August 27, 2010, following his arrest, but did not obtain a confession. Martinez did not handle the investigation of S.P.'s abuse allegations.

Autumn Williams of the Dallas Children's Advocacy Center conducted the July 1, 2010 forensic interview of V.R., who was then thirteen years of age. Williams testified that V.R. told her that appellant, her biological father, "had sexually abused her from the time that she was very young up until the time that she was almost 12 years old." V.R. stated that the abuse happened

---

[4] The REACH physical examination found "no anal or genital trauma noted," but the report also stated: "Lack of findings does not rule out the possibility of abuse. Findings are dependent upon the type of genital contact, timing since, assault and genital makeup."

"a lot" and that appellant "both digitally penetrated her vagina" and "put his penis inside her vagina." V.R. used the word "rape" to describe the penile penetration of her vagina. In addition, V.R. told Williams there were other kinds of abuse: appellant "rubbed with his fingers on the outside of her vagina and had asked her to perform oral, but she resisted that." Williams also testified that V.R. provided the following sensory details regarding the abuse: "She had described pain, and it hurt. She had talked about it being rough and talking [sic] about his body going up and down." V.R., however, "wasn't great at providing sequence, and part of that," according to Williams, concerned "how many times it had happened, so she would say it was the same just because the same sexual acts would occur." Williams testified it was normal for children V.R.'s age who had been sexually abused over a period of years to mix up details or fail to recall every single incident.

Williams testified that V.R. stated the abuse first occurred when appellant was sitting at the computer waiting for it to load, and V.R. was on the couch watching television. Appellant walked over to V.R. and touched her leg. He tried to touch her vagina, but there was no penetration. The first instance of penetration occurred later, in the living room of the family's Fox Hollow apartment. V.R. stated that appellant had her lay "down flat on the couch where she was on her back, and that he was on top of her, and . . . his private part touched her private." V.R. also described an incident where she was sitting on the toilet with the lid down, talking on the telephone. Appellant walked into the bathroom, told her to hang up the telephone, took off her pants, and "opened her legs." V.R. did not give details, "but she talked about white stuff."

Dr. William H. Telford, Jr., a psychologist, was the first witness called by the defense. He testified that he reviewed V.R.'s and S.P.'s medical records and, based on his review of those records, S.P. had been diagnosed with "psychotic disorder with paranoia" and "some severe depression." He added that she had been treated with Haldol, Zoloft, Seroquel, and various

medications for migraine headaches. He testified that he had reviewed medical records from the Centro de Mi Salud Clinic from 1990, and that those records contained the earliest diagnosis of S.P., which "was major depression recurrent, severe, with psychotic features." On cross-examination, however, the State pointed out that S.P. was born in 1990, and Dr. Telford acknowledged that she was not diagnosed with a psychotic disorder as an infant.[5]

Dr. Telford testified that V.R.'s diagnosis, a "psychotic disorder not otherwise specified," was "very similar to her sister's," and that she had been on various medications during her treatment: Risperdal for schizophrenia and severe bipolar disorder, Celexa for depression, Topamax to control seizures, Trazodone, a "fairly powerful sleep medication," and "a half a dozen different medications to deal with migraine headaches." She also had suffered from urinary tract infections since she was a child and had been on various medications to control that. He acknowledged that the psychological disorders he described could have been caused by years of traumatizing sexual abuse, although he insisted that was "quite unlikely." He also testified that he never met S.P., V.R., or their mother, never treated them, but had spoken with appellant about the abuse allegations.

Appellant, a truck driver, testified that he met M.P. in approximately 1996 or 1997, and moved in with her "about three days" after they met. S.P., M.P.'s daughter from a previous

---

[5] The relevant portion of the record reads as follows:

Q. And just to clear something up here, you had said [S.P.'s] disorder, all of these findings came sometime before the sexual abuse allegations?

A. The ones for [S.P.] go back to 1990, yes.

Q. Dr. Tedford, are you aware that [S.P.] was born in 1990?

A. I didn't look up her birthday, but the records that I have from the Centro de Mi Salud Clinic say 1990.

Q. Okay. Would you take my word for it if I told you she was actually born in 1990?

A. Certainly.

Q. Okay. So we're not sitting here saying that she had some psychotic disorder as an infant?

A. No, certainly not.

relationship, lived with them. When he moved in, appellant noticed that S.P. "was always talking back to her mom and all that." M.P. asked for appellant's help in disciplining the child. Appellant testified that he disciplined S.P. by rebuking her, telling her not to talk back to her mother, and by telling her she was not going to play and would have to eat, and do her homework. Appellant testified that he and M.P. argued frequently about financial matters—M.P. thought he was not giving her enough money.

Appellant described his on-and-off relationship with M.P. Appellant lived with M.P., S.P., and V.R. until May 2001, when he moved out of the apartment they shared and moved into his mother's house in Uvalde, Texas. In October 2001, appellant moved back in with M.P. and the girls, but moved out again in February 2002. Appellant would stay with them occasionally—dropping by to do laundry, pick up clean clothes, and give M.P. money—but mostly lived with friends in Richardson, Texas, from February 2002 until May 2003, when he moved to Decatur, Texas. He lived there until March 2005, at which point he moved back in with M.P. and the girls. At that time, they lived at the Fox Hollow Apartments in Grand Prairie. In June 2005, appellant moved out of the apartment and moved into the Tourist Court Motel in Grand Prairie. Asked by defense counsel if, during this time, he saw S.P. or V.R. regularly, appellant replied, "No, no, not at all." He testified that he did not live at the Fox Hollow apartment again until January 2008, when he briefly reconciled with M.P. He moved out again in May 2008, spending a couple of weeks at the motel then moving to an apartment on Beltline, where he stayed until November 2008. Appellant testified that he did not see the children during this time because they did not know where he lived. In September 2008, however, M.P. and the two children found out where he was living and visited him at the apartment complex. Appellant testified that they never spent the night at the Beltline apartment and that V.R. was never alone with him at the apartment because there "was always somebody there."

In October 2008, appellant had what he called "the work crisis" and suffered a significant loss of income—his income dropped from approximately $1200 per week to $200 per week. He moved back in with his mother in Uvalde, where he lived from November 2008 until September 2009. During that time, according to appellant's testimony, V.R. never visited him. Appellant testified that M.P. and V.R. called him in March 2009 and asked if V.R. could spend Spring Break with him, but appellant told M.P. that was not a good idea because he was never home and his job hauling asphalt required him to drive "all over Texas." Appellant returned to Dallas in September 2009 and moved in with his new girlfriend, Bridget Prieto. Appellant testified that M.P. and the girls knew he was back in Dallas because of their telephone conversations. Appellant saw V.R. at M.P.'s apartment after he moved back to Dallas, and his relationship with V.R. was good, but he did not tell the girls about his new girlfriend because he did not want to hurt them. Appellant explained: "I didn't want to hurt my daughter. I didn't want to tell her that I had somebody else and I wasn't going to love her." Appellant testified that from September 2009 until May of 2010, both V.R. and her mother asked appellant "to come home and to live with them again."

In March of 2010, appellant attended a birthday party for V.R. at the Fox Hollow apartment. He was also at the apartment in March for an Easter egg hunt. That same month he and M.P. went to family court in Dallas to assure the continuation of M.P.'s housing and food assistance. Appellant testified that he signed over his parental rights to V.R. in May 2010, after he had a fight with M.P. over the telephone regarding whether V.R. should be dating. The argument ended with appellant telling M.P. he was "out of your life" and that he had a new girlfriend who loved him. That was the last time he talked to her. Appellant testified that V.R. and S.P. overheard the argument and heard him telling M.P. that he was "done" with her and out of her life.

Appellant was arrested at his mother's house in Uvalde in August 2010, where he had recently moved with his new girlfriend. Appellant denied sexually assaulting S.P. and denied doing any of the things she testified about. Appellant testified that he did not even learn about S.P.'s allegations until November 2011, shortly before V.R.'s case was set for trial. Appellant admitted he had not been a "good dad" to V.R., but he denied sexually assaulting her, and appellant pointed out that he did not live at the Grand Prairie apartment from June 2005 through January 2008.

Appellant testified on cross-examination that he thought V.R. fabricated the allegations "[b]ecause I told her I was done with her, and I told her that, and she felt I wasn't going to love her no more, and I had somebody else." Appellant also believed V.R. fabricated the allegations because he had signed away his parental rights. Appellant denied that he had ever been alone with V.R. He testified that when M.P. was out of the house taking care of her parents, it was during school hours, so V.R. and S.P. were either at school or with M.P. Appellant insisted S.P was lying when she testified that she distanced herself from appellant when she grew older, and appellant denied telling the police detective that M.P would sometimes drop V.R. off at his apartment and give him a plate of food. Appellant also testified that the detectives never gave him a chance to explain why V.R. would fabricate the allegations. He insisted the detectives "weren't even giving me a chance to answer anything" and kept telling him "you're guilty" and "you did it."

Appellant's mother, Aurora Ruiz, testified that she knew both V.R. and S.P. because they would visit her on holidays. She also spoke to them over the telephone. S.P. called her "Lala" and V.R. referred to her as "Abuela," the Spanish word for grandmother. Ruiz described a telephone call she received in January 2012, between 6:00 and 7:00 p.m., from an unknown number (the caller ID showed the caller as "unknown") in which the person identified herself as

S.P. The caller referred to Ruiz as "Abuela," and said "their mother was making them lie and that she was sorry." This led Ruiz to conclude the caller must have been V.R. because "Abuela" was V.R.'s nickname for Ruiz.[6] Ruiz believed V.R. was lying when she testified that appellant sexually abused her.

## DISCUSSION

### *Continuous Sexual Abuse of a Child*

In his first issue, appellant challenges the sufficiency of the evidence to support the conviction for continuous sexual abuse of a child in 05–12–01704–CR. In reviewing a challenge to the sufficiency of the evidence, we examine all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Lucio v. State*, 351 S.W.3d 878, 894–95 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.). We must defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson*, 443 U.S. at 326.

The indictment in the continuous sexual abuse of a child case alleged that on or about September 1, 2007, in Dallas County, appellant did:

> Then and there, intentionally and knowingly, during a period that was 30 or more days in duration, when the defendant was 17 years of age or older, commit two or more acts of sexual abuse against [V.R.], a child younger than 14 years of age, hereinafter called complainant, namely by the contact and penetration of the complainant's female sexual organ by the defendant's sexual organ, and by the contact between defendant's hand and complainant's genitals with the intent to arouse and gratify the sexual desire of defendant, and by the penetration of the complainant's female sexual organ by the defendant's finger[.]

> To obtain a conviction for this offense, the State needed to prove beyond a reasonable

---

[6] V.R. denied making that telephone call to Aurora Ruiz.

doubt that, "during a period that is 30 or more days in duration," appellant committed "two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims," and that, at the time of the commission of each of the acts of sexual abuse, he was seventeen years of age or older and V.R. was a child younger than fourteen years of age. *See* TEX. PENAL CODE ANN. § 21.02(b)(1), (2). An "act of sexual abuse" is an act that violates one or more specified penal laws, including aggravated sexual assault of a child under section 22.021. *Id*. § 21.02(c)(4). The jury need not unanimously agree on which specific acts of sexual abuse the defendant committed or the exact date that the acts were committed. *Id*. § 21.02(d). The jury, however, must agree unanimously that the defendant committed two or more acts of sexual abuse during a period of thirty or more days. *Id.*

The testimony of a child victim alone is sufficient to support a conviction for continuous sexual abuse of a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(a); *Lee v. State*, 186 S.W.3d 649, 655 (Tex. App.—Dallas 2006, pet. ref'd); *Vasquez v. State*, Nos. 05–12–00548–CR & 00549–CR, 2013 WL 5614300, at *5 (Tex. App.—Dallas Oct. 14, 2013, no pet.) (mem. op., not designated for publication). A child victim is not required to be specific about the dates the abuse occurred. *See Dixon v. State*, 201 S.W.3d 731, 736 (Tex. Crim. App. 2006) ("Especially where young children are involved, we have cautioned that courts cannot impose unrealistic expectations regarding proof of when an offense actually occurred[.]"); *Sledge v. State*, 953 S.W.2d 253, 256 n.8 (Tex. Crim. App. 1997) ("[I]t is not often that a child knows, even within a few days, the date that she was sexually assaulted."); *Vasquez*, 2013 WL 5614300, at *5.

Appellant argues the evidence is insufficient because V.R. was unable to describe any acts of sexual abuse in detail, her testimony was inconsistent and improbable, she had a history of kidney disease, she had a history of depression, was taking numerous medications, attempted suicide a number of times, and was angry with appellant for terminating his parental rights to

V.R.  These arguments, however, are based on the weight and credibility of the evidence.  As the trier of fact, the jury was the exclusive judge of the witnesses and the weight to be given to their testimony.

The State presented evidence that appellant sexually abused V.R. a number of times over a period of several years, beginning when V.R. was nine years old and continuing until she was twelve.  V.R. testified that she had difficulty recalling precise details of most of the incidents and that she had tried to block out the memories.  She did, however, testify about the first time appellant put his fingers and penis in her vagina, which occurred when V.R. was approximately ten years old.  She testified that the incident occurred in the living room of the Fox Hollow apartment while V.R.'s mother was away.  Appellant sat next to V.R. on the couch, started touching her breasts and vagina over her clothes, then made V.R. take her clothes off and put fingers in her vagina.  He forced her to lie down, took off his pants, and put his penis in her vagina.  V.R. testified that it hurt when appellant did that and that she wanted to cry, but was too scared to cry.  V.R. also testified that appellant put his penis in her vagina on approximately eighteen other occasions, and that he put his hand or fingers in her vagina approximately seventeen times.  The last incident occurred just before V.R. was sent to the Timberlawn hospital following her first suicide attempt.  V.R.'s testimony alone is sufficient to support the conviction. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(a); *Lee*, 186 S.W.3d at 655.

Appellant testified in his defense that he did not live with V.R. during some of the time periods when the abuse allegedly took place, he was never alone with V.R., and that she fabricated the allegations because she was angry appellant had terminated his parental rights. The jury, however, was the judge of the credibility of the witnesses and was free to believe or disbelieve any portion of a witness's testimony.  *See Tran v. State*, 221 S.W.3d 79, 88 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).  Additionally, appellant testified that he lived with

M.P. and V.R. from January 2008 until May 2008. V.R., who was born on March 18, 1997, would have been ten years old during that time period. Thus, the jury could have reasonably concluded the first incident of abuse involving penetration occurred at that time. The jury was also free to accept V.R.'s testimony that the abuse continued until she was approximately twelve years of age, and that the years of traumatizing sexual abuse V.R. suffered caused (or at least contributed to) her psychological difficulties and suicide attempts. "It was within the sole province of the jury to reconcile conflicts, contradictions, and inconsistencies in the evidence." *Id*. at 88 (citing *Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982)). We also note that the jury heard testimony regarding the difficulty child sexual abuse victims have in recalling specific dates or sequences of events when the abuse occurs at a young age and continues for an extended period of time. *See, e.g., Dixon*, 201 S.W.3d at 736. Viewing the evidence in the light most favorable to the verdict, we therefore conclude the evidence is sufficient to support appellant's conviction for continuous sexual abuse of a child. We overrule appellant's first issue.

### *Aggravated Sexual Assault of a Child*

Appellant's second issue challenges the sufficiency of the evidence supporting his conviction for aggravated sexual assault of a child in 05–12–01703–CR. The indictment in the aggravated sexual assault of a child case alleged that on or about August 1, 2000, in Dallas County, appellant did:

> [U]nlawfully then and there intentionally and knowingly cause the contact and penetration of the female sexual organ of [S.P.], a child, who was not then the spouse of defendant, by an object, to-wit: the sexual organ, of said defendant, and, at the time of the offense, the child was younger than 14 years of age[.]

A person commits the offense of aggravated sexual assault, in relevant part, if he intentionally or knowingly "causes the penetration of the anus or sexual organ of a child by any means," or "causes the sexual organ of the child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor," and "the victim is younger than 14 years of

–18–

age." TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (a)(1)(B)(iii), (2)(B). The testimony of a child sexual abuse victim alone is sufficient to support a conviction for aggravated sexual assault. TEX. CODE CRIM. PROC. ANN. art. 38.07(a); *Bargas v. State*, 252 S.W.3d 876, 888 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *Benton v. State*, 237 S.W.3d 400, 404 (Tex. App.—Waco 2007, pet. ref'd); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd). In addition, the victim need not inform another person of the alleged offense if, at the time of the offense, the victim was seventeen years of age or younger. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(b)(1); *Benton*, 237 S.W.3d at 404; *Tear*, 74 S.W.3d at 560.

Appellant argues the evidence is insufficient to support the conviction in the aggravated sexual assault of child case because S.P. testified she suffered multiple acts of abuse but could specifically recall only one incident, her testimony was inconsistent, she delayed coming forward for more than a year after V.R. made her outcry, and she had a history of mental illness. These arguments, however, like appellant's arguments regarding V.R.'s testimony, concern the weight and credibility of the evidence. S.P. testified that the abuse started when she nine or ten years old and in the fourth or fifth grade, and continued until she was fourteen years old. S.P. described several instances of abuse. She testified that the first time appellant had vaginal intercourse with her was in her mother's room at the Donna Lynn Apartments. S.P. recalled laying down on her mother's bed with her clothes off and having "intercourse" with appellant. She testified that it hurt. When appellant was finished, there was "white stuff" on her stomach and she was bleeding from her vagina. S.P. testified that appellant made her go to the restroom afterwards and clean herself up. S.P. also testified regarding two other incidents involving anal sexual intercourse and digital penetration. S.P. testified that appellant forced her to have vaginal and anal intercourse with him on numerous occasions over the years—too many times to count, according to her testimony. The abuse stopped only when S.P. was about fourteen years old and

her best friend moved into the apartment complex.

S.P.'s testimony alone is sufficient to support the conviction for aggravated sexual assault of a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(a); *Tear*, 74 S.W.3d at 560. Although appellant attacks S.P.'s credibility, it was within the province of the jury to reconcile conflicts, contradictions, and inconsistencies in the evidence. *See Tran*, 221 S.W.3d at 88. Furthermore, as we noted earlier, the jury was the sole judge of the weight and credibility of the evidence and was free to believe or disbelieve any portion of a witness's testimony. *Id*. Viewing the evidence in the light most favorable to the verdict, we thus conclude the evidence is sufficient to support appellant's conviction for aggravated sexual assault of a child. We overrule appellant's second issue.

### Costs

In his third issue, appellant argues the evidence is insufficient to support the trial court's order for him to pay $242.25 in court costs in cause 05–12–01703–CR, and $306 in court costs in 05–12–01704–CR. He requests that we reform the trial court's judgments to delete the requirement that he pay court costs because the clerk's records filed in each case do not contain an itemized bill of costs.

After appellant filed his brief, the clerk's record in each case was supplemented and now contains an itemized bill of costs. Specifically, each supplemental clerk's record contains a computer printout itemizing the costs assessed in each case and showing the total costs, and an explanation of the abbreviations used in the itemization. The supplemental clerk's record also includes a bill of costs certification signed by the deputy district clerk and certified by the district clerk. Because each clerk's record now contains a cost bill that supports the costs assessed in each judgment, appellant's complaint that the evidence is insufficient to support the imposition of costs because the records do not contain a cost bill is, therefore, moot. *See Johnson v. State*,

–20–

423 S.W.3d 385, 391–92 (Tex. Crim. App. 2014); *Coronel v. State*, 416 S.W.3d 550, 555 (Tex. App.—Dallas 2013, pet. ref'd). Accordingly we overrule appellant's third issue.

### *Modification of Judgments*

The judgments incorrectly state that the "Sex Offender Registration Requirements do not apply to the Defendant," and state "N/A" for the age of the victim at the time of the offense. Appellant's convictions for aggravated sexual assault of a child and continuous sexual abuse of a child are among those defined as a "[r]eportable conviction or adjudication" for purposes of the sex offender registration statute. *See* Tex. Code Crim. Proc. Ann. art. 62.001(5)(A). As a person who has a reportable conviction or adjudication, appellant is subject to the registration requirements of that program. *See id.* art. 62.051.

As alleged in the indictments and proven in this case, the victims were younger than fourteen years of age on the dates of the offenses. Because we have concluded the evidence is sufficient to support the convictions in each case, and because the offenses in each case required a showing that the age of the victim was younger than fourteen, on our own motion we modify the judgment in 05–12–01703–CR and the judgment 05–12–01704–CR to show the sex offender registration requirements apply and that the age of the victim at the time of the offense was younger than fourteen years of age. *See* Tex. R. App. P. 43.2(b); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd) (appellate court has the authority to modify incorrect judgments sua sponte when the necessary information is available to do so); *see also Tyler v. State*, 137 S.W.3d 261, 267–68 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (authority to modify judgment is not dependent upon a party's request); *Jackson v. State*, Nos. 05–12–00041, 00042, & 00043–CR, 2012 WL 5359513, at \*2 (Tex. App.—Dallas Oct. 31, 2012, no pet.) (mem. op., not designated for publication) (modifying judgments to show applicability of the sex offender registration requirements and age of the victim); *Medlock v. State*, No. 05–

–21–

11–00668–CR, 2012 WL 4125922, *1–2 (Tex. App.—Dallas Sept. 20, 2012, no pet.) (mem. op., not designated for publication) (same); *Johnson v. State*, No. 05–06–00037–CR, 2007 WL 60775, at *7 (Tex. App.—Dallas Jan. 10, 2007, no pet.) (modifying judgments to show applicability of sex offender registration requirements and that age of victim at time of offense was "younger than 14 years of age" because evidence was sufficient to support convictions in each of the counts, which required a showing that the age of victim was younger than fourteen years of age).

As modified, we affirm the trial court's judgments.


/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
121703F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

JOHN ARTHUR RUIZ, Appellant

No. 05-12-01703-CR            V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 1, Dallas County, Texas
Trial Court Cause No. F11-31859-H.
Opinion delivered by Justice Myers.
Justices Lang-Miers and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

"Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62" should be changed to "Sex Offender Registration Requirements apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62"

"The age of the victim at the time of the offense was N/A" should be changed to "The age of the victim at the time of the offense was younger than 14 years of age"

As **MODIFIED**, the judgment is **AFFIRMED**. We direct the trial court to prepare a new judgment that reflects these modifications.

Judgment entered this 30th day of June, 2014.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOHN ARTHUR RUIZ, Appellant

No. 05-12-01704-CR　　　V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 1, Dallas County, Texas
Trial Court Cause No. F11-31315-H
Opinion delivered by Justice Myers.
Justices Lang-Miers and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

"Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62" should be changed to "Sex Offender Registration Requirements apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62"

"The age of the victim at the time of the offense was N/A" should be changed to "The age of the victim at the time of the offense was younger than 14 years of age"

As **MODIFIED**, the judgment is **AFFIRMED**. We direct the trial court to prepare a new judgment that reflects these modifications.

Judgment entered this 30th day of June, 2014.